**FARRELL LINES INCORPORATED** *
v.
The **UNITED STATES.**
No. 42–72.

United States Court of Claims.
June 19, 1974.

---

* This suit is one of thirteen similar cases filed in the court founded upon essentially the same facts. This case has been selected as a test case with the understanding that the other cases will be governed by the disposition of this action to the extent that the claims sued upon in the other cases are essentially the same.

588

T. S. L. Perlman, Washington, D. C., attorney of record, for plaintiff. Richard S. Salzman and Kominers, Fort, Schlefer & Boyer, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and KUNZIG and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR TO REMAND AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge:

Farrell Lines, Inc. contracted with the United States to provide shipping service on essential foreign trade routes for a period of 20 years starting on January 1, 1958. Under the contract, the Government was required to pay an operating-differential subsidy. The Maritime Subsidy Board of the Maritime Administration decided that plaintiff's payments to its employees' training funds and plaintiff's costs (in wages and fund contributions) for the cadets or apprentices aboard its ships as a part of a private training program are ineligible for subsidy.[1] The Board's decisions were affirmed by the Secretary of Commerce. In this action, plaintiff contends that the Board's determination violates the language of the contract and the policy of the Merchant Marine Act of 1936, 49 Stat. 1985, as amended, 46 U.S.C. §§ 1101–1294 (Supp. V, 1969).[2] The Government argues that the Board's action was a proper exercise of its statutory responsibility and that the case should be returned to the Board for further examination in the event we conclude that the costs in question are eligible for subsidy. The case is properly before us on cross-motions for summary judgment because there are no material issues of fact. We hold that the Board's finding of ineligibility is erroneous as a matter of law, but we remand the case for additional determinations yet to be made by the agency.

I

*Background of the Training Payment Controversy*

The request for subsidy payments at issue here arises from technological advancements in the shipping industry and the corresponding changes in collective bargaining agreements. In the 1960's, the advent of modern mechanically complex ships with labor-saving automation brought about both a reduction in crew size on the new ships and a need for technically knowledgeable and skilled personnel. Recognizing both a threat and an opportunity in these new developments, the seafarers' labor unions introduced the subject of employer support for training into collective bargaining negotiations.

[1] The 1936 Act contemplated that the subsidy program would be administered by the United States Maritime Commission. In subsequent reorganizations the functions of the United States Maritime Commission in administering subsidy payments have passed to other administrative bodies. In 1950, the Federal Maritime Board and the Maritime Administration, Department of Commerce, assumed the duties of the U. S. Maritime Commission in subsidy determinations under Reorganization Plan No. 21 of 1950 (64 Stat. 1273, 15 Fed.Reg. 3178). *See also* Act of July 17, 1952, ch. 939, § 21, 66 Stat. 765. With the abolition of the Federal Maritime Board in 1961, Reorganization Plan No. 7 (75 Stat. 840, 26 Fed.Reg. 7315) transferred its functions to the Secretary of Commerce, who subdelegated them in part to the Maritime Administration and in part to the Maritime Subsidy Board within the Maritime Administration. *See* Dept. of Commerce Order No. 117 (26 Fed.Reg. 7713 (1961)), as amended, Dept. of Commerce Organization Order No. 10–8 (37 Fed.Reg. 15179 (1972)).

[2] We are concerned with the language of the Merchant Marine Act of 1936, as amended, prior to the changes made in 1970 (84 Stat. 1018).

As early as the 1958 bargaining round, the radio officers' unions sought and obtained additional support for training by means of an agreement to permit the unions' welfare funds to bear the cost. The agreement provided for no increase in the employer's contributions to this fund; the cost of the training programs was, in effect, borne by the union members through the use of moneys of the Welfare Fund that would otherwise have been available to them for insurance, medical, or other benefits. Later, the radio unions bargained successfully for a five percent wage increase for graduates of the training programs, their new skills being valuable to the owners.

In 1963, the engineer officers' union, the National Marine Engineers Beneficial Association (MEBA), agreed with the owners to take part of a three and one-half percent wage increase (obtained two years earlier after a strike that caused a national emergency) in the form of increased contributions to the MEBA's Welfare Fund. By agreement between the employers and the union, the welfare trustee then used a portion of the augmented fund to set up and support training for union engineers to "upgrade" their licenses and to learn welding and electricity.

In 1965, the National Maritime Union (NMU) bargained for and received employer contributions of $.25 a day for each NMU crew member employed to compensate for the reduction in the size of the unlicensed crew. With this fund, designated as an "automation fund," the trustees of the NMU's Welfare Funds were authorized to establish a school.[3] Unlike the previous instances, this fund consisted of a contribution of "new mon-

ey" by the owners in support of training.

The 1965 contract renewals for the MEBA, Masters, Mates and Pilots Union (MM&P), and the American Radio Association were achieved only after a 77-day strike—the longest strike in the history of the offshore shipping industry. The owners sought firm agreement on lesser manning; the officers sought higher wages on the new ships and training for handling them at the owner's expense. The dispute was settled only after bitter bargaining under pressure for settlement from Government officials, up to and including President Johnson.

In the resulting settlement, the training issue for the MEBA was resolved by requiring the subsidized employers to maintain a training program for engineers assigned to automated ships and to pay a premium in wages for these trained engineers. The MM&P did not win their demands for training costs because the arbiter, Professor Walter Gellhorn, held that, although training for deck officers was desirable, it was not essential. The MM&P then elected to allocate part of one of its annual wage increases to a training program.[4]

With the advent of a heavy sealift to Vietnam in 1966, the Government's employment of ships from the reserve fleet caused a shortage of seamen; sailings were delayed and ships sailed shorthanded. *See* Maritime Manpower Shortage, Hearings Before the Special House Subcomm. on Maritime Education and Training of the Comm. on Merchant Marine and Fisheries, 89th Cong., 2d Sess. 129–30 (1966). To help alleviate the shortage, a joint industry-union school was established by MEBA to train engi-

---

3. When founded, this school qualified for and obtained a grant under the Federal Manpower Development and Training Act (42 U.S.C. § 2583 (1970)), became licensed by the State University of New York, and trained many seamen. The NMU curriculum covered all the trades of unlicensed ratings; especially notable was its course for deck engine mechanics, a rating created for automated ships.

4. Automation, cargo handling, and other subjects were offered in this program and during the manpower shortage after 1966 unlicensed seamen were trained to become officers. The MM&P ultimately also gained an increase in employer contributions to the fund.

neers for automated ships and to offer an accelerated course for new men seeking to become engineers. The course included on-the-job training through service of apprentice or cadet engineers in vacant engineers' positions on working ships. The school was financed in part by increased employer contributions to the MEBA training fund, in part by engineers foregoing part of a wage increase, and in part by paying the apprentice engineers a low wage (and contributing to the training fund the difference between that pay and the wages of the regular engineers). In 1966, the Radio Officers Union established a similar apprenticeship program, financing it by reduced contributions to its welfare fund and replenishing the fund by the difference between the regular wage scale and the reduced wage of the apprentice radio officers. Plaintiff was a party to all these collective bargaining agreements and trusts, as were scores of other shipping companies, subsidized and unsubsidized.

In accordance with Circular Letter No. 8–60 issued in 1960, the operators were required to submit a justification for increases approved and concessions made by them in collective bargaining agreements. Plaintiff submitted requests for the payments in issue, and they were denied by the Subsidy Board and the Secretary of Commerce. The contributions to training funds, designated as Count I, and apprentices costs in wages and fund contributions, designated as Count II, were treated in several actions before the Subsidy Board.

In dealing with Count I, the Subsidy Board, on July 13, 1965, declared that contributions to the MEBA Welfare Fund to be used for training (Docket No. A–14) and contributions to the NMU's "automation fund" (Docket No. A–15) were ineligible for subsidy. The Subsidy Board based its decision on the fact that the specific use of the fund was not certain and upon its finding

that the employer contributions to these funds were not "wages" within Section 603(b) of the 1936 Act. On appeal, the Secretary of Commerce affirmed the Board's decision as to the MEBA training fund contributions and the MNU "automation fund" costs. The Secretary further held, however, that the disallowances in Docket A–14 could be reconsidered by the Subsidy Board along with other aspects of the Board's decision that were reversed.

On December 17, 1965, the Subsidy Board reaffirmed its prior position on the MEBA Welfare Fund contributions and the NMU's "automation fund." At that time, the Subsidy Board's action also included a determination affecting plaintiff that was not mentioned in the prior series "A" decisions. The Board found that the 1961 and 1964 agreements with the Radio Officers Union (ROU) were ineligible for subsidy, because they were not within the definition of "wages" under section 603(b) as interpreted in the Manual of General Procedures for Determining Operating-Differential Subsidy Rates (hereinafter sometimes referred to as Manual).

On December 27, 1965, plaintiff filed a general petition for reconsideration with the Subsidy Board. Plaintiff also submitted additional information in 1966 and 1967 to the Board concerning the MEBA, NMU, and ROU plans. On February 20, 1969, the Subsidy Board found the MEBA training fund costs ineligible for subsidy and issued a lengthy opinion, entitled Docket No. A–36, stating its reasons and conclusions. For the first time, the Board held that such expenses were ineligible for subsidy because of the provisions of Section 216 of the Merchant Marine Act.[5] In a summary paragraph of Docket No. A–36, the Board stated:

> Based on the foregoing, it is the opinion of this Board that the contributions in question are neither "wages" nor "other items of expense" eligible

---

5. For a detailed statement of the provisions of Sections 216 and 603(b) of the Merchant Marine Act and the Manual see discussion *infra*.

for subsidy participation in keeping with the provisions of the "Manual" and consonant with long-established precedent on this subject by this Board and its predecessor agency, the Federal Maritime Board. Further, in keeping with the Merchant Marine Act of 1936, as amended, the Congress has made specific provisions for training under Section 216 of the Act which does not provide for the type of subsidy herein requested by the subsidized Operators.

Plaintiff appealed the decision in Docket No. A–36 to the Secretary of Commerce. Once again, the Secretary remanded the case to the Board, this time with observations and directions as to procedure. On March 31, 1970, the Subsidy Board reaffirmed the earlier decision that training costs for the NMU and the ROU programs were ineligible for subsidy. The Board issued its final decision in Docket No. A–36 on December 10, 1970, denying subsidy.

The Maritime Administration first took action with respect to the training costs claimed in plaintiff's Count II in 1966. Pursuant to Administrative Order No. 184, the Board's staff rendered a determination in the form of Office of Government Aid Determination No. 13 issued May 2, 1966. On August 9, 1966, the Maritime Administration issued Accounting Instruction No. 44 to all operators, stating that in accordance with Government Aid Determination No. 13, wages and expenses for persons assigned to vessels of subsidized operators in a training program other than those assigned in accordance with Section 216 of the Merchant Marine Act would not be eligible for subsidy. On September 29, 1966, plaintiff along with other shipowners challenged this declaration by filing an appeal with the Subsidy Board. In response, the Board issued Circular Letter No. 3–69, on June 24, 1969, upholding the staff's position. In Circular Letter No. 3–69, the Board stated:

Section 216 of the Merchant Marine Act of 1936, as amended, sets forth the Government's policy on the training of seamen * * *. The only training for which funds have been authorized by Congress is that which is controlled and supervised by the Government itself. Section 216 is clear on this point. For this reason it would be improper to channel unauthorized subsidy into private training programs through a separate program under Section 603(b) * * *.

In making this decision, the Board also took cognizance of the provisions of Section 603(b) of the Act, Article I–4 of the subsidy contracts, and the "Manual" regulations governing the payment of subsidy on wages and subsistence of officers and crews. Although it was apparent that trainees receive wages per se, the Act, as implemented by the subsidy contract and "Manual" which the subsidized operators have accepted, limits the "wages" subsidy to payments to members of the crew complement or relief complement of subsidized vessels for services rendered and required for the efficient and economical operation of such vessels. In other words, wages of supernumerary personnel are not subsidizable wages because they are paid to prospective crew members, not regular crew members. Neither can such payments qualify for subsidy under the category "other items of expense." As long as a specific statute enables Marad to provide training at Government expense, it would not be consistent with the rules of statutory interpretation to find that training expenses are embraced within the general category of "other items of expense" * * *.

This view was subsequently reaffirmed by the Subsidy Board on April 7, 1970, in a lengthy decision captioned Docket No. A–41.

On November 11, 1970, the Subsidy Board rendered a supplemental opinion setting forth its views with respect to subsidies claimed for medical center fund contributions (used primarily for pre-employment medical examinations),

a hiring hall fund used to operate union dispatching and hiring halls, and the contributions to several union training programs in issue.[6] Restricting this opinion to additional contentions raised by the operators, the Subsidy Board concluded that none of the claimed expenses were for "wages" or "other items of expense" within the meaning of Section 603(b) of the 1936 Act, stating:

> That the present items are overhead or shore expenses and not "fringe benefits," and for good reason should not be considered for subsidy, is apparent from this opinion and the Board's previous opinions in these cases. These expenses are shore items because they relate to a medical center, hiring halls and training facilities [excluding apprentices' service aboard ship], all physically located ashore. They are not related to vessel operations except perhaps to an inconsequential degree. In the same manner, these expenses do not directly benefit officers and crews of subsidized vessels as is the case with eligible wage or benefit items; they instead benefit unemployed seamen. Further, these expenses are overhead items of the ship operator inasmuch as he is securing a ready, competent pool of manpower. Such service expense is an overhead item.

The final agency decision on the training payment controversy was issued by the Secretary of Commerce on December 23, 1970. The Secretary affirmed the Board's decision in Docket Nos. A–36 and A–41. He held that Section 216 provided specific authorization for such expenditures; that training is more in the nature of an overhead than an operating expense;

and that subsidy for training would only be appropriate when it contributes to ship operations as in the case of an apprentice actually serving as a part of the ship's authorized complement. On the same day, the Secretary reversed the Board's determinations on the operators' contributions to the unions for pre-employment medical examinations and for the operation of hiring halls and approved the payment of subsidies for such expenses.

As a result of these decisions, the Government has "suspended" all expenses claimed for private training in plaintiff's subsidy accounts.

There are four types of training payments involved in this case: (1) payments to a trust fund devoted exclusively to training; (2) payments to other welfare funds, portions of which were spent by their trustees for training and other portions for medical, hospital, insurance, and like benefits; (3) apprentices' pay, and (4) contributions to funds on account of the employment of apprentices. Plaintiff seeks in this action to recover the amount of the subsidy alleged to be due for its payments to the various union training programs.

## II

### The Eligibility of the Training Payments in Issue for Subsidy

■ The Merchant Marine Act of 1936 was passed for the purpose of achieving a balance between the costs of building and operating American flag vessels and the costs incurred by competing foreign shippers. It was felt that such public assistance to the shipping industry was necessary for the national defense and the development of foreign and domestic commerce. The

6. In its decision of September 5, 1968, the Subsidy Board stated that payments to the medical center fund were unsubsidizable under the 1936 Act and the Manual. In that opinion, the Board emphasized that at the time of the pre-employment medical examination, the seaman is not employed on a subsidized vessel operating in subsidized service and that such expenses were com-

monly regarded as an administrative overhead expense regardless of their incorporation in the collective bargaining agreement (Docket No. A–34).

In Docket No. A–40, decided on March 31, 1970, the Subsidy Board refused to pay subsidy for activities of the hiring halls because the ODS was not intended to cover union shoreside overhead costs of this type.

public funds provided to achieve a "parity" of operating expenses are termed the operating-differential subsidy (ODS). The Government is empowered to enter into contracts with American shipowners to provide an ODS with certain limitations on payment of the subsidy set out in Section 603(b) of the Act. As originally enacted, section 603(b) read in pertinent part:

Such contract shall provide that the amount of the operating-differential subsidy shall not exceed the excess of the fair and reasonable cost of insurance, maintenance, repairs not compensated by insurance; *wages,* and subsistence of officers and crews, and *any other items of expense* in which the Commission shall find and determine that the applicant is at a substantial disadvantage in competition with vessels of the foreign country hereinafter referred to, in the operation under United States registry of the vessel or vessels covered by the contract, over the estimated fair and reasonable cost of the *same items of expense* * * * if such vessel or vessels were operated under the registry of a foreign country whose vessels are substantial competitors of the vessel or vessels covered by the contract * * *. 49 Stat. § 2002 (1936) (Emphasis added.)

In compliance with the Act, Article I–4 of plaintiff's Contract No. FMB–64 reads:

(a) In order to place the proposed operations of the vessels named in this agreement on a parity with those of foreign competitors, and subject to all the terms of this agreement and effective as prescribed in Article I–10 of this agreement, the United States shall, pursuant to Section 603(b) of the Act, pay to the Operator, as Operating-Differential Subsidy, sums equal to the excess of the fair and reasonable cost (as determined by the Board) of insurance, maintenance, repairs not compensated by insurance, *wages* and subsistence of officers and crews, and *any other items of expense*

in which the United States shall find and determine that the Operator is at a substantial disadvantage in competition with vessels of the foreign country hereinafter further described in the operation under United States registry of the vessels covered by this agreement, over the Board's estimate of the fair and reasonable cost of the *same items of expense* (after deducting therefrom any estimated increase in such items necessitated by features incorporated pursuant to the provisions of Section 501(b) of the Act) if such vessels were operated under the registry of a foreign country whose vessels are substantial competitors of the vessels covered by this agreement. Subsidy payments shall be based upon rates determined in accordance with Section 603(b) of the Act, which rates the Board determines will place the Operator on a parity basis with his foreign flag competitors. Such payments shall be made only with respect to voyages of the vessels named in Article I–3 hereof performed within the maximum number of voyages authorized in the services described in Article I–2 hereof. It is understood and agreed that during any national emergency declared by the President of the United States or by Congress of the United States by virtue of which the Operator's normal commercial subsidized operations are disrupted adjustment of subsidy payments shall be made as determined by the Board pursuant to the methods prescribed in Section 606(1) of the Act or other applicable provisions of law. Board determinations under this Article shall be final and conclusive. (Emphasis added.)

To implement the subsidy program, the Maritime Subsidy Board has followed the practice of making an initial determination as to whether an expenditure claimed by the operator is eligible for the subsidy, that is, whether the 1936 Act authorizes the payment of a subsidy for the particular expenditure. If the Board finds the expense to be eli-

gible, it proceeds thereafter to determine whether the item is one with respect to which the ship operator is at a substantial disadvantage in competition with foreign vessels and, if so, the excess of the fair and reasonable cost incurred by the American operator over the estimated fair and reasonable cost incurred by his foreign competitor for the same item of expense. In this case, the determination by the Subsidy Board, as affirmed by the Secretary of Commerce, has extended only to a decision that payment of the subsidy for the training costs at issue here is not authorized by the provisions of the 1936 Act. Therefore, the primary question before us is whether the plaintiff shipowner's costs for union training benefits constitute "wages" or "any other items of expense" in the operation of the vessel within the meaning and intent of the applicable statute and the terms of the contract.

■ 1. Both parties agree that the court has jurisdiction to review decisions of the Subsidy Board and the Secretary of Commerce, but they differ as to the scope of review. The issue before us is one of contract interpretation. The scope of the contractual phrase "wages * * * and any other items of expense" is a question of law. This court has repeatedly held, in varying contexts, that administrative decisions interpreting the provisions of a contract are not binding on us. *See, e. g.,* Sea-Land Service, Inc. v. United States, Ct. Cl., 493 F.2d 1357, at 1361 (1974); Northwestern Industrial Piping, Inc. v. United States, 467 F.2d 1308, 1310–1311, 199 Ct.Cl. 540, 545 (1972); Paschen Contractors, Inc. v. United States, 418 F.2d 1360, 1361, 190 Ct.Cl. 177, 180 (1969); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 867, 181 Ct.Cl. 607, 626 (1967). These decisions are based upon Section 2 of the Wunderlich Act, 41 U.S.C. § 322 (1970), which applies to plaintiff's contract. It makes no difference that a subsidy is involved in this case. Contracts for operating-differential subsidies are to be treated like any other commercial contract between the United States and a private party. *See* Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 996n.7, 998, 184 Ct.Cl. 169, 180n.7, 184 (1968).

■ There remains only a question of whether the subsidy contract in this case creates a discretionary area within which the agency will be allowed a wider scope of authority in carrying out its contractual obligations. While the plaintiff is suing on a contractual right, the Government is quite correct in arguing that the scope of the contractual language is directly related to the statutory authority for the subsidy payments. The Merchant Marine Act of 1936 requires the inclusion of the disputed contractual language, and the parties by the contractual agreement did not intend to alter the plan prescribed by Congress for the payment of subsidies. *Cf.* Pacific Far East Line, Inc. v. United States, 394 F.2d at 996, 184 Ct.Cl. at 180–181.

■ The broad scope of the term "any other item of expense" and the legislative background of its inclusion in the statute (discussed below), and subsequently in the contract, indicate that Congress and the contracting parties intended to allow the agency some discretion in implementing the subsidy provisions. Neither the contract nor section 603(b), however, give the agency unlimited discretionary authority in administering the payment of subsidy. The fact that contract article I–4(a) states that "Board determinations under this Article shall be final and conclusive" does not limit our review. Section 2 of the Wunderlich Act is explicit on this point. 41 U.S.C. § 322 (1970).

■ We have held that a party vested with contractual discretion must exercise its discretion reasonably and fairly, Fox Valley Engineering, Inc. v. United States, 151 Ct.Cl. 228, 236 (1960), and subsidy contracts are no exception. *See* Pacific Far East Line, Inc. v. United States, 394 F.2d at 998, 184 Ct.Cl. at 184. The subsidy payments are not a Government grant. *See* Moore-Mc-

Cormack Lines, Inc. v. United States, 413 F.2d 568, 582, 188 Ct.Cl. 644, 667 (1969). The Government has promised to pay subsidy for the vessel operating expenses under certain conditions, and plaintiff has given valuable consideration. As we stated earlier, the parties did not intend to alter the plan prescribed by Congress for the payment of subsidies, and the Government does not have discretion to declare items ineligible for subsidy when such action would conflict with Congressional authorization for such payment. We find that in deciding the issue before us, the Subsidy Board and the Secretary of Commerce have not followed the guidelines set forth in the statute; they have not been consistent in their administration of the law, and their decisions are, in part, based upon the application of a regulation in a manner which is repugnant to the provisions of the statute and the contract. For these reasons, we reverse the administrative decisions.[7]

2. The Government relies heavily on the arguments presented in the various decisions of the Subsidy Board and the Secretary of Commerce. Basically, the Government contends that the Subsidy Board properly determined that plaintiff's expenditures for training were ineligible for subsidy, because Section 216 of the Merchant Marine Act was intended to provide the exclusive authorization for governmental support of training; that Congress did not consider the payments involved here to be "wages" or "any other items of expense" in the operation of the vessel under Section 603(b) of the Act; and that under administrative practice and the criteria established in the administrative manual, training payments do not qualify for subsidy treatment.

A. *Section 216 of the Merchant Marine Act.* Section 216 of the Merchant Marine Act directs the Secretary of Commerce to establish the United States Maritime Service as a voluntary training organization and the Merchant Marine Academy for selected (Congressionally nominated) cadets. 46 U.S.C. § 1126 (1970). It also authorizes him to provide training of those cadets on vessels and in shipyards, and to conduct extension and correspondence courses. *Id.* Defendant's position is that section 216 is the sole basis through which Government aid may be extended to Government or private training programs. However, the defendant has been unable to convince us that there is any provision in the Act or its history which shows a clear intent to restrict all Federal support for training to section 216.

Section 216 does not even mention private training, subsidy, subsidy contracts, "wages," "other items of expense," or any other of the subsidy provisions of the Act. It does not provide that anything done under that section is exclusive of anything provided elsewhere in the Act.

Although there is a dispute between the parties as to whether, in fact,[8] the Government actually paid subsidies for cadets' wages prior to the enactment of section 216,[9] it is clear that the Maritime Commission recognized its authority under the 1936 Act to support training prior to the enactment of section 216. *See* Economic Survey of the American Merchant Marine, United States Maritime Commission 50 (1937). When the Maritime Commission asked for ex-

---

7. It is not necessary in this action to scrutinize the legal validity of the procedures used by the Subsidy Board and the Secretary of Commerce in determining eligibility. The case is basically presented to us on the merits as a question of law, and we reach our decision on that issue.

8. This factual dispute does not create a material issue of fact that would prevent our reaching the merits on the parties' cross-

motions for summary judgment under Rule 101(d).

9. In 1938, the forerunner of section 216(a) was added, creating the United States Maritime Service and directing the Commission to report back to Congress on training. Act of June 23, 1938, § 44, ch. 600, 52 Stat. 965. In 1939, section 216(b) was added providing for training of merchant marine cadets. Act of Aug. 4, 1939, § 5, ch. 417, 53 Stat. 1182.

press authority in section 216 to establish and maintain a broad training system, it observed that it believed it already had such authority (but wanted an express provision before making larger outlays). *See* S.Rep.No., 1618, 75th Cong., 3d Sess. 22 (1938). The Congress evidenced no intention to confine the pre-existing Federal power to support training to section 216.

The history of section 216 reveals no express intention to alter or restrict the application of section 603(b), and there is no conflict or manifest inconsistency between the two sections of the statute that would lead to the conclusion that the scope of section 603(b) was limited by implication. Defendant concedes that, in practice, union programs do not interfere with the administration of section 216.[10] For the most part, the Department of Commerce trains new deck and engine officers, not experienced mates and engineers, radio officers, or unlicensed men. Graduates of the Academy have elected to take part in the unions' training so as to qualify themselves for automated ships. The Academy and the union schools together do not fully supply the needs for new officers. The Academy's engineering cadets and the MEBA's apprentice engineers serve aboard ships in mutual harmony without impeding each other's training.

■ Finally, defendant maintains that section 216 precludes the payment of subsidy because the training is a subject of predominant Federal interest which should be under Federal control and because the acceptance of the plaintiff's position would allow operators, in their private capacity, to define the training needs of American seamen and to foist the major share of the financial burden on the public treasury. Both of these contentions simply miss the mark. The 1936 Act safeguards ·the treasury against excess public expenditures for training by requiring that the costs be

fair and reasonable and that the operator be in a position of substantial disadvantage with respect to his foreign competitors. As for Federal control, Congress clearly recognized the Federal responsibility to support the training of seafarers, but nothing in Section 216 of the Act or elsewhere provides that the Maritime Administration facilities shall provide all training of merchant mariners. We find that section 216 was not intended to operate to the exclusion of other training programs which are equally consistent with the Act's general purpose of fostering and encouraging the development of trained personnel. We do not consider whether it would be advisable to have centralized control of all training. Such an inquiry is more properly addressed to Congress.

■ Generally, courts will not construe a section of an act, in the absence of an unmistakable directive, in a manner which runs counter to the broad goals Congress sought to achieve. *See* Federal Trade Commission v. Fred Meyer, Inc., 390 U.S. 341, 349, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). The object of the subsidy provisions is to place contractors on a parity of costs with their foreign competitors. A construction of section 216 which would make the private training expenditures in this case ineligible for subsidy may very well· preclude the attainment of that objective.

B. *Section 603(b) of the Merchant Marine Act.* Section 603(b) provides that the amount of the subsidy shall not be more than the fair and reasonable cost of the "wages * * * and any other items of expense" in which the Maritime Subsidy Board and the Secretary of Commerce shall determine the contractor is at a substantial competitive disadvantage in the operation of the vessel. Moreover, this section specifically requires that the amount of the subsidy not be greater than the excess of the American owner's fair and reasonable

---

10. There have been instances of duplication in the types of courses offered. The Board has conducted open training courses in radar, lifeboat handling and firefighting, gyro- compass, loran, NBC warfare and damage control. Plaintiff and at least one union offer courses in some of these fields.

costs over the fair and reasonable cost of the "same items of expense" that would arise if the vessel were operated competitively under foreign registry. Putting aside the questions of fairness and reasonableness of the training payments and the substantial foreign disadvantage, we focus on whether the training payments in issue are "wages" or "any other items of expense" in the operation of the vessel, and whether the Subsidy Board and the Secretary of Commerce have followed the statutory requirement that items of expense on the American side should be compared with the same items of expense on the foreign side.

In addition to the argument based on section 216, the various orders and decisions of the Subsidy Board, as approved by the Secretary of Commerce, state several reasons for the Board's finding that the training payments claimed in Counts I and II are not within the category of "wages" or "any other items of expense." The stated additional reasons are: Congress did not intend to subsidize shoreside, overhead, or pre-operating expenses; the agency has consistently viewed private training costs as unsubsidizable overhead costs; Congress used the term "wages" in a "take-home-pay" context; and the training payments in issue do not come within the definition of wages in the Manual.

Plaintiff contends that the officers and crews bargained collectively for the training payments as one of the benefits that members of the crew require to induce them to man and work plaintiff's ships. Consequently, the argument continues, the training payments are part of the "wages" under the union contract, and if not wages, then they are "any other items of expense."

 1. Generally, wages are understood to be the compensation allowed to seamen for their services on board a vessel during a voyage. In this case,

however, it is unclear on the face of this section of the statute whether "wages" or "any other items of expense" include the training payments at issue, and therefore we turn to the legislative history for guidance. A statute cannot be divorced from the circumstances existing at the time it was passed or from the evil which Congress sought to prevent and correct. Benton v. United States, 488 F.2d 1017, 1021, 203 Ct.Cl. ——, —— (1973); Akins v. United States, 439 F.2d 175, 177, 194 Ct.Cl. 477, 483 (1971). It must be kept in mind that the purpose of the 1936 Act was to place the proposed operations of the vessels on a parity with those of foreign competitors. The operating-differential subsidy is designed in large part to repay the difference in the cost of labor under American standards and such cost under foreign standards. In addition, Title I of the Act, "Declaration of Policy," states "[i]t is necessary * * * that the United States shall have a merchant marine * * * manned with a trained and efficient citizen personnel." 46 U.S.C. § 1101 (1970).

 The Merchant Marine Act of 1936 arose out of the failure of the ocean mail subsidy contract program to establish a permanent United States merchant marine on a sound basis. Various investigations of practices under those contracts revealed that many operators had diverted subsidies to other than shipping operations by such means as the payment of enormous salaries and bonuses to shoreside personnel and by creating affiliated corporations that siphoned subsidies from subsidized corporations.[11] In an effort to insure that future subsidies would reach the intended beneficiaries, the bills, as originally introduced, specified "insurance, maintenance repairs, and the wages and subsistence of officers and crews" to be eligible for subsidy.[12] Industry spokesmen requested the addition of the

---

11. *See* S.Rep.No.898, 74th Cong., 1st Sess. 18–33 (1935); H.R.Doc.No.118, 74th Cong., 1st Sess. 11 (1935).

12. S. 2582, 74th Cong., 1st Sess. § 505(c) (1935); H.R. 7521, 74th Cong., 1st Sess. § 505(c) (1935).

phrase "other items of expense" to cover all other items augmenting the competitive differential.[13] It was recognized by Congress that the phrase "other items of expense," as introduced, would cover at lease overhead or shore expenses.[14] After considerable controversy section 603(b) was enacted as it now reads with the addition of the category "any other items of expense" and a directive to the Commission to determine that the applicant is at a substantial disadvantage in competition with vessels of the foreign country.[15] Thus, the Congress opted not to restrict the category of items eligible for subsidy, but chose to provide for flexibility on this point and to allow subsidy for other items, including shoreside or overhead expenses, in which the Commission determines the owners are at a substantial competitive disadvantage in the operation of the vessel. We think that Congress intended that the Commission use its expertise and discretion in administering the "any other items of expense" provision.[16] However, the administering authority must operate within the general guidelines set out in the statute.

It is not enough to say that training expenses are shoreside, overhead, or pre-operating costs, because such items are not *per se* ineligible for subsidy under the statute, and, in practice, subsidies are paid for costs of this type. The training expenses in Count I are no more a pre-operating, shoreside, or over-head expense than are the payments made for pre-employment medical examinations for seamen or the payments made to operate and maintain union dispatching and hiring halls—both of which now receive subsidy. It is interesting to note that the Subsidy Board originally denied subsidy to all three types of expenses, and upon a request for reversal the Board considered all three types of expenditures in one opinion.[17] The Board stated that all three categories of expense were shore expenses, that they are not sufficiently related to vessel operation, that they do not directly benefit officers and crews (they benefit unemployed seamen), and that they are overhead items inasmuch as they help to secure competent manpower. This opinion was affirmed only as to the training expenses by the Secretary on December 23, 1970. On the same day, the Secretary of Commerce issued separate decisions with respect to medical examinations for seamen and hiring halls in which he reversed the Board and found that both of these items contributed sufficiently to ship operation to warrant treating them as "any other items of expense." As far as eligibility is concerned, it is obvious that the contributions for preemployment medical expenses and the operation of union hiring halls are no more pre-operating, shoreside, or overhead expenses than the training costs claimed in Count I.[18]

---

13. *See* Hearings on H.R. 7521 before the House Committee on Merchant Marine and Fisheries, 74th Cong., 1st Sess. 691 (1935) ; Hearings on S. 2582 before the Senate Committee on Commerce, 74th Cong., 1st Sess. 153–54 (1935).

14. *See* Hearings on H.R. 7521, *supra* note 13, at 696; Hearings on S. 2582, *supra* note 13, at 212, 521–22 (1935).

15. The House Committee initially amended its bill to cover "insurance, maintenance repairs, wages and subsistence of officers and crews, and *any other items of expense (excluding shore expenses) in which the Authority may deem that the applicant is at a substantial disadvantage in competition with vessels of the foreign country * * *.*" H.R. 8555, 74th Cong., 1st Sess. § 522(b)

(1935) (emphasis added). In this form the bill was reported and passed the House. H.R.Rep.No.1277, 74th Cong., 1st Sess. 22–23 (1935) ; 79 Cong.Rec. 10289 (1935). When the bill was finally enacted, however, the parenthetical phrase (excluding shore expenses) had been deleted.

16. *See* Hearings on 7521, *supra* note 13, at 910; Hearings on 2582, *supra* note 13, at 522–23.

17. Def. Ex. 2.

18. The Secretary's determinations cited above were not mandated by the changes in the Act of October 21, 1970, amending the Merchant Marine Act of 1936. For the first 2 years only, the 1970 Act exempts from collective bargaining costs "items of cost

On November 25, 1966, the Secretary of Commerce also recognized that severance pay is eligible for subsidy as wages or other items of expense. The training expenses are no more a pre-operating expense than severance pay is a post-operating expense. The fact that an employee actually works for the shipowner prior to receiving severance pay is not a controlling distinction. Moreover, nearly all fringe benefits share the characteristic of being enjoyed ashore. If location ashore were decisive, then pensions, vacation pay, unemployment compensation, and certain other benefits financed by contributions to welfare funds would be unsubsidizable. Yet the agency has approved the payment of subsidies for the cost of all these items as "other items of expense" and subsidies are paid on them continuously.

 Conflicts and inconsistencies in an agency's construction of a statute may be significant in determining whether to affirm an agency determination. In withholding approval of agency action, the Supreme Court has emphasized the fact that the agency decision in question was in conflict with other agency determinations. *See* Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 274, 280, 282, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); Barrett Line, Inc. v. United States, 326 U.S. 179, 65 S.Ct. 1504, 89 L.Ed. 2128 (1945). Other courts have also relied, in part, upon the fact that the agency position was inconsistent with its decision in similar cases. National Labor Relations Board v. Pittsburgh Plate Glass Co., 270 F.2d 167, 174–175 (4th Cir. 1959) cert. denied, 361 U.S. 943, 80 S.Ct. 407, 4 L.Ed.2d 363 (1960), and upon the fact that the agency had not followed a uniform policy in administering the statute. Arnold Tours, Inc. v. Camp, 472 F.2d 427, 436 (1st Cir. 1972). To the extent that training costs have been disallowed on grounds that they are preoperating, shoreside or overhead expenses, the agency's past practice in dealing with expense items other than training costs is wholly inconsistent with its determination that training costs are ineligible for subsidy.

Notwithstanding its allowance of similar expense items, the Government points out that the Maritime Administration has consistently refused to recognize training costs as eligible for subsidy except in the case of Federal cadets. There is a dispute between the parties as to whether subsidies were paid for apprentices in the early years of the subsidy program and whether the Government is now subsidizing the apprenticeship program used by the Radio Officers Union.[19] Whatever the facts may be regarding this dispute, it is more significant that the operators were not obligated to pay training expenses such as those at issue until the late 1950's. At that time, provisions for private training programs were incorporated in collective bargaining agreements,

that have been disallowed by the Secretary of Commerce prior to ninety days following October 21, 1970 * * *." 46 U.S.C. § 1173(c)(1)(B) (1970). The Secretary's decisions were within this 90-day period.

19. Plaintiff has shown that members of the Radio Officers Union apprenticeship program receive subsidy for the time the members serve in the position of Chief Radio Officer. The training requirements during this part of the program are imposed only by the union. The Chief Radio Officer, as defined by the Maritime Administration, is a radio operator who has met all the requirements of the Federal Communications Commission, 47 C.F.R. § 83.152, and the U.S. Coast Guard, 46 C.F.R. Subpart 10.13, and serves as the radio officer in complete charge of and responsible for the radio room. While the union considers the employee in training during his service as a Chief Radio Officer, the Maritime Administration does not. That situation is distinguishable from the situation presented in Count II where the apprentice is not recognized by the regulatory bodies as a licensed engineer. The Maritime Administration's payment of subsidy to the radio officers, designated by the union contract as an "apprentice", is not directly inconsistent with its position in this case on the interpretation of Sections 216 and 603(b) of the Act.

at a large expense to subsidized operators; the eligibility of such payments for subsidy under section 603(b) became important, and this case arose. In light of these new developments and the Maritime Administration's treatment of similar expense items resulting from collective bargaining, the agency's past practice in dealing with private training is of little aid in determining the eligibility of the training costs involved in this case.

■ 2. Perhaps the most glaring misapplication of the statutory provision in this case is the fact that training expenses are treated as items of expense on the foreign side in making the subsidy calculations. Under section 603(b), the measure of the subsidy is the excess of the American contractor's wages and any other items of expense over "the same items of expense" on the foreign side. Plaintiff has presented evidence to show that for at least 20 years the Maritime Administration has included foreign shipowners' training payments in the foreign "wages" cost in computing the subsidy. The defendant acknowledges that foreign training costs are considered in subsidy calculations. This treatment of training payments as "the same items of expense" on the foreign side in computing the subsidy is a recognition that such payments are "wages" or "any other items of expense" on the American side. The disparate treatment of the domestic and the foreign training payments, counting the expense on the foreign side while excluding such payments from the American side, directly contravenes the system for subsidy payment prescribed by the Congress. While it is common to defer to agency expertise in many matters, the agency charged with administering a

statute may not adopt a position inconsistent with the enabling statute. *See* Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); National Labor Relations Board v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); Benton v. United States, 488 F.2d 1017, 1023, 203 Ct.Cl. ——, —— (1973). This is even more true in this case where the Maritime Administration has a contractual obligation to pay subsidies in accordance with the statutory mandate.

■ 3. Although the drafters of the 1936 Act may have thought of wages in a "take-home-pay" context, as defendant maintains, we need not decide whether these training payments are wages *per se.*[20] The training payments at issue are closely akin to the concept of "wages" as used in the 1936 Act and sufficiently related to vessel operations so that they fall easily into the final category of "any other items of expense." The training payments are part of the agreed consideration for the crews' services; the payments are measured by the volume of employment of crews and ships in productive services; the apprentices' pay is a monthly wage or a contribution to a fund on account of the employment of apprentices; the owners derive a direct benefit in vessel operation from trained and efficient crew services and such payments are consistent with the purpose and policy of the Act. There is no allegation that the payments to the training funds are being siphoned off for purposes other than training or that they are otherwise being used in a manner inconsistent with the Merchant Marine Act.[21]

4. In 1957, the Maritime Administration, with the approval of the Committee

---

20. In one of its few reported cases the Federal Maritime Board held that the cost of repatriating seamen from a foreign port as required by a collective bargaining agreement is wages. The rationale was that wages include whatever the seamen bargained for. American President Lines, Ltd.

—Final Subsidy Rates, 1949, 1950, 4 F.M.B. 329, 333 (1953).

21. We decide this case on its facts. It is not necessary to reach the question of whether all the benefits in a collective bargaining package fall within the category of "any other items of expense."

of American Steamship Lines,[22] revised its Manual of General Procedures for Determining Operating-Differential Subsidy Rates for the purpose of establishing guidelines for calculating ODS payment. The Manual describes subsidizable items in these words:

Part Seven

Definitions of Subsidizable
Items of Expense

*Section I—Wages of Officers and Crews*

Wages consist of the fair and reasonable cost of payments made by the operators directly to or for the benefit of (to the extent indicated below) members of the crew complement and relief complement of subsidized vessels for services rendered and required for the efficient and economical operation of such vessels, provided that they are not recoverable from shippers, receivers or other third parties.

Crew complement shall be construed to mean, in addition to the master, those officers and ratings approved by the Federal Maritime Board as being eligible for rate-making purposes. Relief complement shall be construed to mean those officers and ratings assigned to relieve in port members of the crew complement.

 A. *Payments Eligible For Rate-Making and Subsidy Payment Purposes*

 1. Base Wages.

 2. Overtime, including penalty time pay.

 3. Vacation pay (earned in subsidized services) .including contributions to union vacation funds.

 * * * * * *

 5. Pension, welfare and unemployment fund contributions.

Defendant contends that the definition of wages in the Manual excludes all plaintiff's training costs, because the fund contributions do not benefit the approved crew complement. Defendant also argues that apprentices do not render services required for the economical and efficient operation of the vessel. The 1957 Manual is defendant's principal administrative reference and the defendant seeks to apply the Manual as a binding interpretation of the statute and the contract.[23] It is clear, however, that the Manual does not establish the necessary ascertainable standards for interpreting section 603(b) in the present controversy. The Manual does not expressly define the term "any other items of expense." Apparently the Maritime Administration left this category open in order to make additions to the list of enumerated items eligible for subsidy on an *ad hoc* basis. Contributions used for hiring halls, pre-employment medical costs and severance pay have all been subsidized. There are no criteria in the Manual for differentiating between the cost of the training payments claimed in Count I and those which have been allowed.

The defendant's right to rely on the Manual as a basis for denying the subsidy for the costs claimed in Count II (wages and fund contributions for apprentices and cadets) is precluded, because of defendant's long continued practice of including the same costs incurred by foreign shippers in making the ODS calculation. The application of the Manual in such circumstances would not only be arbitrary and unfair, but it would be inconsistent with the provisions of the statute under which the Manual was issued, namely, the requirement that the subsidy rates be calculated by comparing the "same items of expense" incurred by American and for-

---

22. Now succeeded by the American Institute of Merchant Shipping.

23. In addition to interpreting contract article I–4(a), defendant emphasizes that the Manual applies by virtue of contract article II–9(g) which binds the operator to observe defendant's rules and regulations "governing the selection of cadets or apprentices to be carried on subsidized vessel(s) as an expense of subsidized operation, and their minimum wages, working conditions, status, duties and course of training."

eign ship operators. Since a regulation which is inconsistent with an enabling statute is invalid, the application of a regulation in a manner which conflicts with the provisions of the statute is equally invalid. *See* Seagrave v. United States, 131 Ct.Cl. 790, 795, 128 F.Supp. 400, 403 (1955) and cases cited therein.

5. Relying on our decisions in Sun Shipbuilding & Dry Dock Co. v. United States, 183 Ct.Cl. 358, 393 F.2d 807 (1968) and Lykes-Youngstown Corp. v. United States, 190 Ct.Cl. 348, 420 F.2d 735 (1970), cert. denied, 400 U.S. 865, defendant maintains that plaintiff is bound by the Board's interpretation of the contract because plaintiff knew or had reason to know of this interpretation at the time the contract was executed; consequently, plaintiff accepted the Board's interpretation. In both of those cases, however, when the contracts were executed, the contracting parties (with the exception of Sun Company) were familiar with the Board's policy guidance letter and knew the meaning the Government gave to the contract articles in question. This case does not present such clear evidence of knowledge on the part of the plaintiff.

The defendant has not shown that the Maritime Administration had ruled on the eligibility of any of the training expenses in issue or of any training expenditures required by a collective bargaining agreement prior to the date of plaintiff's contract. As previously discussed, the legislative history of the Merchant Marine Act and the criteria for subsidy payment as stated in the Administrative Manual (especially as such criteria have been applied) do not exclude private training payments from eligibility for subsidy. Defendant has not shown that plaintiff knows or had reason to know of the Board's interpretation to the contrary.

6. Defendant also argues that the failure of Congress to amend the Act in the face of the known administrative interpretation over the years constitutes persuasive evidence that such interpretation is the one intended under the statute. While it is recognized that, in certain instances, Congressional acceptance of an administrative interpretation may be inferred from silence over a period of years, such an inference is directly related to the factual circumstances involved in each case. Large scale training programs were first included in collective bargaining agreements in the late 1950's. Prior to that time, the agency's position on the possibility of subsidizing the shipowner's payment of training expenses under collective bargaining agreements had not been sufficiently articulated by the agency to have been approved *sub silentio* by Congress. The mere fact that subsidies were not customarily paid for a particular item, such as training costs, does not mean that the Congress by its silence intended section 603(b) to exclude expenses that were not receiving subsidy at any given time.

The 1970 amendments to the Merchant Marine Act provide the most significant legislation bearing on the subject of Congressional endorsement of the agency's position. It is established that at least one of the two agency decisions involved in this action was known to the Senate Committee on Commerce while the 1970 Act was still in bill form. *See* Hearings on S. 3287, Senate Comm. on Commerce, 91st Cong., 2d Sess. 136–38 (1970). The 1970 Act did not simply reaffirm the prior language, however. The Merchant Marine Act of 1970 amended the statutory section 603(b) substituting "subsidizable wage costs" for "wages" and "any other items of expense." 46 U.S.C. § 1173(b) (1970). The "subsidizable wage costs" are determined by applying an index of the rate of change in wages and benefits to the collective bargaining costs. 46 U.S.C. § 1173(c)(1)(D) (1970). The term "collective bargaining costs" means "the annual cost * * * of all items of expense required of the applicant through collective bargaining or other agreement, covering the employ of United States officers and crew of a vessel * * *." 46 U.S.C. § 1173(c)(1)(A)

(1970). As the Senate Committee noted, "The term 'collective bargaining costs' would include \* \* \* training fund contributions and any other items included in the collective bargaining contract as a result of good faith bargaining between employer and employee." S.Rep. No. 91–1080, 91st Cong., 2d Sess. 35 (1970). U.S.Code Cong. & Admin. News, p. 4208.

█ Congressional reenactment in the face of a known administrative interpretation has been found to be a guide in interpreting a statute where Congress reenacted the applicable section of the statute without material change, especially in tax cases. *See e. g.,* Cammarano v. United States, 358 U. S. 498, 510–511, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959); National Labor Relations Board v. Gullett Gin Co., 340 U.S. 361, 366, 71 S.Ct. 337, 95 L.Ed. 337 (1951). *See also* Davis, Administrative Law Treatise § 5.07 (1958). Here, on the other hand, Congress has amended the statutory provision in issue and we are unable to find in such action Congressional acceptance of the agency's position. The fact that no provision was made in the 1970 Act for retrospective relief from the Board's published determination, which is a part of this case, is of little aid to us in interpreting the prior statute.

### III

### *Further Agency Action*

As previously stated, neither the Subsidy Board nor the Secretary of Commerce has determined the fair and reasonable cost of the training expenses in issue, nor has an administrative finding been made that these are items of expense as to which the plaintiff is at a substantial disadvantage in competition with foreign vessels.[24] We agree with the defendant that this case should be remanded to the agency (with appropriate instructions) to make the initial determination on these remaining questions.

█ Plaintiff vigorously opposes such a remand to the agency and argues, first, that there is no need to remand the question as to whether plaintiff was at a "disadvantage in competition" because its total labor costs, including the training costs, are considerably greater than the foreign labor costs. Plaintiff also says that the Board's estimate of foreign costs has been fixed by agreement and, therefore, it has been established as a matter of law that plaintiff is at a substantial disadvantage. Plaintiff next contends that, since it was required to pay the training costs in issue as a result of collective bargaining agreements made with the unions at arm's length and in good faith, such costs are fair and reasonable as a matter of law. We cannot accept plaintiff's contention that the matters to be remanded are solely questions of law within the exclusive jurisdiction of the court. Under both the Merchant Marine Act and the contract, the Subsidy Board is entitled to make these determinations, at least in the first instance. *Cf.* Moore-McCormack Lines, Inc. v. United States, *supra,* 413 F.2d at 588, 188 Ct.Cl. at 676–677.

We agree that the training expense which plaintiff was required to pay as a result of such collective bargaining agreements constitutes an important, and perhaps the most important, factor in the determination of whether such costs are fair and reasonable. However, we do not agree that the results of the collective bargaining agreements, even if made at arm's length and in good faith, are conclusive on this question. In that

---

24. The single exception is that involving certain training plans for the years 1961–1964. In 1962, the Subsidy Board determined that the costs under all collective bargaining agreements made in the 1961 bargaining round were fair and reasonable. That determination covers the costs of at least one training program in this case, the first engineers' program. In 1965, the Secretary of Commerce found that all costs under labor agreements made before 1965 were fair and reasonable.

connection, defendant has called our attention to a letter of January 8, 1970, from plaintiff's attorneys to the Secretary of the Maritime Subsidy Board. In that letter it was stated, among other things, that the fairness and reasonableness of the training costs involve many issues of law, of fact, and of mixed law and fact, including a study of the costs of comparable programs elsewhere.[25] In addition, plaintiff recognizes that, in determining fair and reasonable costs, the agency has historically followed the practice of basing subsidy rates for all ships in service on the cost of typical ships. Plaintiff also points out that different manning practices and other factors may cause a variation in monthly wage costs between types of ships, and that types of ships in service may vary from time to time. Plaintiff concedes that in making its determination of the fair and reasonable costs, the agency has latitude in choosing among the types of ships.[26]

We can well understand the indignation which plaintiff has expressed over the delays which occurred in the administrative process of determining the eligibility of the training costs—a procedure which cumulatively consumed a period of more than 4 years. However, if plaintiff is correct in stating that the Subsidy Board already has all or most all of the information needed for the determinations to be made on remand, those determinations can be made with dispatch. While we hold that the applicable statute and the contract authorize the Subsidy Board and the Secretary to make an initial determination of the remaining questions, we are not required to grant the agency an unreasonable period of time for making such decisions. Public Law No. 92–415, 28 U.S.C. § 1491 (Supp. II, 1972), empowers the court to remand appropriate matters to any administrative body or official with such directions as we deem just and proper.

Accordingly, it is ordered that defendant's motion for summary judgment and plaintiff's cross motion for summary judgment are denied without prejudice. Pursuant to Pub.L. 92–415, *supra,* and the court's General Order No. 3 of 1972, it is further ordered that this case is remanded to the Maritime Subsidy Board and the Secretary of Commerce, for a period not to exceed 6 months, for their determination of the questions stated above in a manner consistent with this decision. Further proceedings in the court shall be stayed during the period fixed by this order of remand. Defendant's counsel is designated to advise the court by letter to the Clerk of the status of the remand proceedings as provided for in Paragraph 9(a) of the General Order with such advice to be given at intervals of 90 days or less commencing from the date of this decision.

---

25. Def. Memo Ex. 31.

26. Plaintiff's memo in Docket No. 402–70, American Export Isbrandtsen Lines, Inc. v. United States, Ct.Cl., 499 F.2d 552.