**AERON MARINE SHIPPING
COMPANY et al.**

v.

**The UNITED STATES.**

No. 106–85C.

United States Claims Court.

June 27, 1986.

Mark P. Schlefer, Washington, D.C., for plaintiff. T.S.L. Perlman, Leonard Egan, and Kominers, Fort, Schlefer & Boyer, of counsel.

Michael T. Paul, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant. James F. Ford and Timothy Shea, Maritime Administration, Dept. of Transp., of counsel.

## OPINION

LYDON, Judge:

Plaintiffs, seven (7) shipping companies, seek to recover from defendant over $110,-150,000 in damages, claiming the government breached operating-differential subsidy agreements they had with the United States to provide shipping services in foreign commerce in competition with vessels of foreign registry built in foreign countries. In their complaint, plaintiffs challenge a January 29, 1985 determination by the Maritime Subsidy Board of the Maritime Administration, Department of Transportation [1] (hereinafter the Board), denying their July 23, 1984 application, filed pursuant to 46 U.S.C. § 1176 (1), for review and readjustment of future payments of operating-differential subsidy under their existing agreements. The application sought establishment of a fuel subsidy rate for each plaintiff for each year since the commencement of subsidized operation of their subsidized vessels. The subsidy was to reflect the difference between the costs incurred for fuel in such subsidized operations and the costs incurred for fuel by similar vessels operating under the registry of a foreign country, to the end that plaintiffs' vessels would be made competitive with such foreign vessels.[2]

Both parties have moved for summary judgment. Plaintiffs' motion challenges the validity of the Board's determination denying them fuel cost subsidies. They also maintain that their entitlement to the fuel cost subsidy sought is mandated by the applicable statute, implementing regulations and the related terms of their operating-differential subsidy agreements.[3] Defendant's motion rests on the contention that this court lacks jurisdiction to review the Board's denial of plaintiffs' claims for fuel cost subsidies. Upon review of the submissions of the parties, and after oral argument, the court concludes that it does have jurisdiction in this case and that the Board did not give proper consideration to plaintiffs' application for fuel cost subsidy. The court further concludes that the matter must be returned to the Board for additional proceedings.

---

1. On or about August 6, 1981, pursuant to Pub.L. No. 97–31, 95 Stat. 161, 46 U.S.C. § 1114 (1982), the functions germane to this case were transferred from the Department of Commerce to the Department of Transportation, *i.e.,* the functions of the Maritime Subsidy Board and the Maritime Administration were transferred to the Department of Transportation from the Department of Commerce with respect to operating-differential subsidy contracts, *inter alia.*

2. Plaintiffs also seek in their complaint an order from the court declaring their future entitlement to fuel cost subsidies. Under the circumstances of this case, the court lacks the authority to grant declaratory judgments. *See Williams Intern. Corp. v. United States,* 7 Cl.Ct. 726, 730–31 (1985).

3. At oral argument, plaintiff intimated that the relief it primarily was seeking from this court was a remand of the matter to the Board for further consideration regarding the fuel cost subsidy issue.

## I. *Background*

The Merchant Marine Act of 1936, 49 Stat. 1985 (pertinent current version at 46 U.S.C. §§ 1101–1295g) (1982) (the Act), established an elaborate system for subsidizing both the domestic merchant marine and domestic shipbuilders. Congress felt it was necessary for national defense to have a merchant marine capable of carrying all domestic cargo (cargo shipped between two United States ports) and hopefully a substantial portion of all foreign cargo (export and import). *See* 46 U.S.C. § 1101 (1982).

The United States Court of Claims in *Moore-McCormack Lines v. United States,* 188 Ct.Cl. 644, 649–50 and nn. 2–4, 413 F.2d 568, 570–71 and nn. 2–4 (1969), provided an appropriate and pertinent background statement for this litigation, which statement reads as follows:

Since at least the turn of the century, United States shipowners and ship-builders have been unable to compete effectively with foreign shipyards and operating fleets. The higher wage rates for skilled laborers and more stringent safety standards prevailing in this country result in much higher costs for the production of ships; higher seamen's wages, more protective working conditions, and greater food, outfitting, insurance, and repair costs make it impossible for a shipowner operating in foreign commerce to compete with ships under foreign flags.[2] Indirect and direct subsidies given shipyards and operating fleets by other nations further aggravate the disparity in costs. As this competitive reality became apparent, the reaction of the American shipping industry was to have its ships built abroad, registered under foreign flags, and manned by foreign seamen.

---

[2] This is not so true of ships plying the domestic and intercoastal trades, which are specially shielded from the competition of foreign-flag ships.

After World War I, during which this country's military efforts suffered from lack of an adequate merchant navy and trained sailors, Congress decided that the national security required a sound merchant marine, to protect foreign trade, to develop American seamen, and to provide support for the armed forces in time of war or national emergency. Congress also deemed essential to preparedness a modern, efficient shipbuilding industry, capable of providing military vessels in periods of stress. To stimulate the building of new ships and to maintain a merchant marine under the United States flag, the Jones-White Act of 1928, 45 Stat. 689, provided for construction loans and an indirect subsidy through ocean-mail contracts to vessels giving regular foreign shipping service. Reported abuses by the subsidized companies resulted in extensive investigations, and in 1936 Congress chose to replace the hidden subsidy of the ocean-mail contracts with direct subsidies to equalize the position of American-flag and foreign flag shipowners with respect to operating expenses, construction costs, and foreign subsidies.

Although the details of the legislation have been changed frequently, the basic concept has remained the same—a government authority is empowered to enter into contracts with American shipowners to provide an operating-differential subsidy, a construction-differential subsidy, and a special subsidy to meet extraordinary aid to foreign shipping lines by their governments.[3] The purpose of each subsidy is to put the American-flag owner on a parity with his foreign competitor; he is to get his ship for the price his competitor would pay,[4] his labor and operating expenses at the foreign rate, and he is also to be in a position to neutralize any extraordinary help received by his competitor. The Federal Government bears this burden of the higher cost of constructing and operating the ships. In turn, the subsidized shipowner shoulders a number of obligations, chiefly the maintenance of the vessel under United States registry.

---

[3] *See* §§ 501–05, 601–03, 604 of the Merchant Marine Act of 1936, ch. 858, 49 Stat. 1985, 46 U.S.C. §§ 1151–55, 1171–73, 1174 (1964).

[4] Subject, always, to the limitations imposed by the statutory maximum for the construction-

differential subsidy of, at present, no more than 55% of the domestic price.

Although they appear in separate sections of the Merchant Marine Act, and are meant to serve separate functions, the operating and construction-differential contracts are closely interrelated. An owner accepting construction aid agrees to keep his ship under the American flag for twenty years, an obligation he would and could probably not assume were it not for the operating subsidy. Conversely, there is an intimate connection between the plaintiffs' long-term (20–year) operating-differential contracts and their construction agreements. In general, no vessel is eligible for this operating subsidy unless constructed in an American yard. In order to guarantee the replacement of obsolete vessels and further stimulate construction in American shipyards, the operating contracts set out, for each operator, a schedule of new vessel construction. The owner is obliged to meet this schedule, or subject its operating subsidy contract to cancellation, if the Government supplies a construction-differential subsidy for each replacement ship.

The present litigation concerns the operating-differential subsidy (ODS) provided by the Merchant Marine Act of 1936, as amended, *supra*. Under the Act, the Secretary of Transportation (formerly the Secretary of Commerce) is authorized and directed to consider the application for ODS of any citizen of the United States for financial aid in the operation of a vessel or vessels that are to be used in an essential service in the foreign commerce of the United States. 46 U.S.C. § 1171. Generally, no contract for ODS shall be made by the Secretary until a determination is made that ODS is necessary to meet competition of foreign-flag ships. 46 U.S.C. § 1172. If the Secretary approves any such application, he may enter into a contract with the applicant for the payment of ODS determined in accordance with subsection (b) of Section 1173 for the operation of such vessel or vessels in an essential service (defined in 46 U.S.C. § 1171) for a period not exceeding twenty years. The contract may be subject to such reasonable terms and conditions, consistent with the Act, as the Secretary shall require to effectuate the purposes and policy of the Act. 46 U.S.C. § 1173(a). The purpose of ODS was to help develop an American merchant fleet that would be competitive with foreign flag fleets. *State Marine Intern., Inc. v. Peterson*, 518 F.2d 1070, 1076–77 (D.C.Cir. 1975), *cert. denied sub nom. American Maritime Ass'n. v. Richardson*, 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976).

The Act also stated in pertinent part that an ODS contract between the Secretary and an applicant:

* * * [S]hall provide, unless the parties should agree upon a lesser amount, that the amount of the operating-differential subsidy for the operation of vessels in an essential service shall equal the excess of the subsidizable wage costs of the United States officers and crew, the fair and reasonable cost of insurance, subsistence of officers and crews on passenger vessels, * * *, maintenance and repairs not compensated by insurance, incurred in the operation under United States registry of the vessel or vessels covered by the contract, over the estimated fair and reasonable cost of the same items of expense * * * if such vessel or vessels were operated under the registry of a foreign country whose vessels are substantial competitors of the vessel or vessels covered by the contract: *Provided, however*, That the Secretary of Transportation [Commerce] may, with respect to any vessel in an essential bulk cargo carrying service as described in section 1121(b) of the title, pay, in lieu of the operating-differential subsidy provided by this subsection (b), such sums as he shall determine to be necessary to make the cost of operating such vessel competitive with the cost of operating similar vessels under the registry of a foreign country * * *. [46 U.S.C. § 1173(b).]

Finally, the Act provided, in pertinent part, for ODS contract review and readjustment as follows:

Every contract for an operating-differential subsidy under this subchapter shall provide (1) that the amount of the future payments to the contractor shall be subject to review and readjustment from time to time, but not more frequently than once a year, at the instance of the Secretary of Transportation or of the contractor. If any such readjustment cannot be reached by mutual agreement, the Secretary of Transportation, on his own motion or on the application of the contractor, shall, after a proper hearing, determine the facts and make such readjustment in the amount of such future payments as he may determine to be fair and reasonable and in the public interest. The testimony in every such proceeding shall be reduced to writing and filed in the Office of the Secretary of Transportation. His decision shall be based upon and governed by the changes which may have occurred since the date of the said contract, with respect to the items theretofore considered and on which such contract was based, and other conditions affecting shipping, and shall be promulgated in a formal order, which shall be accompanied by a report in writing in which the Secretary of Transportation shall state his findings of fact; * * * (3) that if the Secretary of Transportation shall determine that a change in an essential service, which is receiving an operating-differential subsidy under this subchapter, is necessary in the accomplishment of the purposes of this chapter, he may make such change upon such readjustment of payments to the contractor as shall be arrived at by the method prescribed in clause (1) of these conditions; (4) that if at any time the contractor receiving an operating differential subsidy claims that he cannot maintain and operate his vessels in such an essential service, with a reasonable profit upon his investment, and applies to the Secretary of Transportation for a modification or rescission of his contract to maintain such essential service, and the Secretary of Transportation determines that such claim is proved, the Sec-

retary of Transportation shall modify or rescind such contract and permit the contractor to withdraw such vessels from such essential service, upon a date fixed by the Secretary of Transportation, and upon the date of such withdrawal the further payment of the operating-differential subsidy shall cease and the contractor be discharged form any further obligation under such contract; * * *. [46 U.S.C. § 1176.]

## II. *Facts*

The seven plaintiffs in this case, shipping companies, are corporations organized and existing under the laws of Delaware (plaintiff Aeron Marine Shipping Company (Aeron Marine) and plaintiff Aries Marine Shipping Company (Aries Marine)) or Oregon (plaintiff American Shipping, Inc. (American) and plaintiff Pacific Shipping, Inc. (Pacific)); or limited partnerships organized and existing under the laws of New York (plaintiff Atlas Marine Company (Atlas), plaintiff Aquarius Marine Company (Aquarius) and plaintiff Worth Oil Transport Company (Worth Oil)).

Leo V. Berger is president of plaintiffs Aeron Marine, Aries Marine, American and Pacific, and is a general partner in plaintiffs Atlas, Aquarius and Worth Oil. He signed the ODS contracts in issue on behalf of plaintiffs and has been the chief executive officer of the shipping business of the plaintiffs since their inception. Apex Marine Corporation has been the operating agent for the vessels involved in this litigation, with its principal place of business in Lake Success, New York. Plaintiffs were organized in 1971 for the purpose of engaging in the subsidized construction and operation of United States vessels.

Plaintiff Aeron Marine entered into an ODS agreement (MA/MSB–166) with the Secretary of Commerce, through the Board, on June 30, 1972, pursuant to which it has operated in subsidized service from December 13, 1974 to the present the United States vessel Golden Endeavor, and, from October 10, 1974 the United States vessel Golden Dolphin. Both of these ves-

sels were built at San Diego, California in 1974 under June 1971 construction-differential subsidy (CDS) contracts pursuant to the Act. 46 U.S.C. § 1151 *et seq.* Plaintiff Aeron Marine ceased operating the vessel Golden Dolphin on or about March 7, 1982, when it was lost at sea.

Plaintiff Aries Marine entered into an ODS agreement (MA/MSB–129) with the Secretary of Commerce, through the Board, on June 30, 1971, pursuant to which it has operated in subsidized service from August 9, 1973 to the present, the United States vessels Ultramar and Ultrasea. Both of these vessels were built at San Diego, California in 1973 and 1974, respectively, under June 1971 CDS contracts pursuant to the Act.

Plaintiff American entered into an ODS agreement (MA/MSB–272) with the Secretary of Commerce, through the Board, on June 26, 1973, pursuant to which it has operated in subsidized services from April 14, 1976 to the present the United States vessel Beaver State. This vessel was built at San Diego, California, in 1976 under a June 1971 CDS contract pursuant to the Act.

Plaintiff Pacific entered into an ODS agreement (MA/MSB–278) with the Secretary of Commerce, through the Board, on June 26, 1973, pursuant to which it has operated in subsidized service from July 24, 1976 to the present the United States vessel Rose City. This vessel was built at San Diego, California in 1976 under a June 1971 CDS contract pursuant to the Act.

Plaintiff Atlas entered into an ODS agreement (MA/MSB–274) with the Secretary of Commerce, through the Board, on June 26, 1973, pursuant to which it has operated in subsidized service from December 30, 1976 to the present the United States vessel American Heritage. This vessel was built at San Diego, California in 1976 under a June 1971 CDS contract pursuant to the Act.

Plaintiff Aquarius entered into an ODS agreement (MA/MSB–309) with the Secretary of Commerce, through the Board, on May 30, 1974, pursuant to which it has operated in subsidized service from October 15, 1975 to the present the United States vessel Golden Monarch. This vessel was built at San Diego, California in 1975 under a June 1971 CDS contract pursuant to the Act.

Plaintiff Worth Oil entered into an ODS agreement (MA/MSB–271) with the Secretary of Commerce, through the Board, on June 26, 1973, pursuant to which it operated in subsidized service from February 20, 1976 the United States vessel Worth. This vessel was built at San Diego, California in 1976 under a June 1971 CDS contract pursuant to the Act. On or about October 31, 1984, plaintiff Worth ceased subsidized operation of the vessel Worth, having sold the vessel.

All of the above-mentioned vessels, except the Ultramar and the Ultrasea (operated by plaintiff Aries Marine), are tank vessels designed primarily for the carriage of liquid petroleum in bulk. Each of these vessels has a cargo deadweight capacity of approximately 89,700 deadweight tons and a service speed of about 16½ knots. The Ultramar and the Ultrasea are ore-bulk-oil vessels designed for the carriage of dry bulk cargo and liquid petroleum in bulk. These two vessels have a cargo deadweight capacity of approximately 82,000 deadweight tons and a service speed of about 16½ knots. All of the vessels in issue are or were operated in foreign commerce in competition for liquid petroleum, dry bulk and other cargoes with tankers and dry bulk carrier vessels of foreign registry built in foreign countries. The competitive foreign vessels have cargo deadweight capacities ranging from about 80,000 tons, more or less, to about 100,000 tons, more or less, and service speeds between 16 and 17 knots, more or less. Plaintiffs' vessels were considered bulk cargo vessels engaged in carrying bulk cargo in essential services in the foreign commerce of the United States and thus eligible for ODS as defined in 46 CFR § 252 (1985).

As indicated earlier, each of the plaintiffs' ODS contracts were for 20–year terms. Six of the seven contracts in issue

(*i.e.*, the Aeron Marine, the American, Pacific, Atlas, Aquarius and Worth Oil agreements that were entered into during the 1972–1974 period) contained the following pertinent provisions:

### I-4. *Determination of Amount of Subsidy.*

(a) Subject to all of the terms of this Agreement, the United States shall, pursuant to Section 603 of the Act, pay to the Operator as operating-differential subsidy (except as the parties may by addendum hereto agree upon a lesser amount) an amount determined by the United States, equal to the excess of the subsidizable wage costs of the United States officers and crews, the fair and reasonable cost of insurance, maintenance, and repairs not compensated by insurance incurred in the operation in an essential service, under United States registry of the vessels covered by this Agreement, over the United States' estimate of the fair and reasonable cost of the same items of expense (after deducting therefrom any estimated increase in such items necessitated by features incorporated pursuant to the provisions of Section 501(b) of the Act) if such vessels were operated under the registry of a foreign country whose vessels are substantial competitors of the vessels covered by this Agreement. Subsidy payments shall be based upon rates determined by the United States in accordance with the provisions of Section 603 of the Act (except as the parties may by addendum hereto agree upon a lesser amount).

\* \* \*

(b) When any final operating-differential subsidy rates are determined by the United States with respect to subsidizable items of expense related to any subsidized vessel engaged in authorized service and commencing on or after the effective date of this Agreement, the same shall be incorporated herein by addendum and when so incorporated, the operating-differential subsidy computed in accordance with such rates shall be paid to the Operator in accordance with and subject to the conditions set forth in Article II–20 of this Agreement. For the purposes of this Agreement, authorized service is service made pursuant to, and in accordance with, this Agreement.

Pending the establishment and determination of final operating-differential subsidy rates by the Board, the Operator shall receive payments on account on the basis of tentative operating-differential rates fixed by the United States for authorized service of vessels assigned by Article I–3 hereof commenced on or after the effective date of this Agreement. Such payments shall be made to the operator in accordance with Article II–20 of this Agreement.

When said tentative rates are superseded by revised tentative or final operating-differential subsidy rates, determined by the United States and applicable to such vessels, appropriate adjustments shall be made to conform therewith and subsequent payments or recoveries of overpayments, if any, shall be made pursuant to Article II–20 hereof.[4]

The Aeron Marine agreement also contained the following pertinent provision which was not to be found in the other six ODS agreements:

(g) In addition to the operating-differential subsidy otherwise provided for in this Agreement, the United States agrees to make a subsidy payment with respect to a propulsion system expense differential as between the subsidized vessels named in Article I–3 hereof and similar competitive foreign-flag vessels. Such differential will be composed of a fuel expense differential offset by a main engine upkeep and overhaul expense differential and shall be subject to the following terms and conditions:

(1) Payments shall be made for a period not to exceed seven (7) years commencing with the operation under the

---

**4.** The totality of the provisions in the Aries Marine agreement, which was entered into in 1971, were substantially to the effect of the above quoted provisions. *See, e.g.,* Articles I–4; II–21 and II–22 of the Aries Marine agreement.

time charter to Golden Eagle Liberia Limited of each subsidized vessel named in Article I–3 hereof.

(2) The method for calculating the fuel and upkeep and overhaul expense differentials shall be adopted by the Board after affording the Operator a reasonable opportunity to comment. The periodic determinations of the differentials shall be determined finally by the Board in its sole discretion and such determinations shall not be subject to the hearing provisions of Section 606(1) of the Act but the Operator shall be afforded the opportunity to review the basis used in such determinations and to provide factual data with respect thereto.

(3) Payments shall be made in accordance with the provisions of Article II–20 of this Agreement, excepting subparagraph (a)(1) thereof.

(4) No payment under paragraph (g) of this Article shall be made for any voyage days within the said seven (7) year period when the charter hire on the subsidized vessel(s) exceeds $2.67 per deadweight ton per month, and in the event of any such payment when the charter hire exceeds such rate the Operator shall make repayment immediately.

In accordance with the provisions of the plaintiffs' ODS agreements, the parties executed addenda to said contracts relative to tentative operating subsidy rates for each year since the contracts were executed. By means of these addenda, plaintiffs and defendant have, from time to time, agreed on operating-differential subsidy rates for wages of officers and crew, for hull and machinery insurance, as well as protection and indemnity insurance, and for repairs not compensated by insurance. By mutual agreement, the subsidies relative to these items were determined, reviewed, and readjusted. Pursuant to these established tentative rates, subsidy payments were made to plaintiffs on an ongoing basis. Final rate addenda for all specific ODS rates for the seven contracts from the years of contract inception through the 1980 rate year

had been executed by the parties prior to July 23, 1984. Up to July 23, 1984, no subsidy for fuel costs had been sought by plaintiffs, nor had any fuel cost subsidy been paid to plaintiffs as of that date.

On July 23, 1984, plaintiffs formally requested MSB review and readjustment of subsidy relative to their ODS agreements, pursuant to 46 U.S.C. § 1176(1) and Article I–5, seeking for each plaintiff, covering the period since the commencement of subsidized operations of their subsidized vessels and running into the future periods of their contracts, "a fuel subsidy rate reflecting the difference between the costs incurred for fuel in their subsidized operations and the costs incurred for fuel by similar vessels operating under the registry of a foreign country, to the end the [plaintiffs'] vessels shall be made competitive in respect of fuel costs with such foreign vessels."

On January 29, 1985, the MSB denied plaintiffs' July 23, 1984 application for subsidy review and readjustment in pertinent part as follows:

The Board denied the request for fuel subsidy and for a hearing under section 606(1). For all companies except Aeron, the reasons were as follows:

1. There is no statutory mandate for the Board to pay subsidy on the basis that the total cost of operating a subsidized vessel has not been at a parity with the total cost of operating similar vessels under the registry of foreign countries. Under section 603(b), particular operating items are subsidizable, exclusive of fuel cost differential. Under the section 603(b) proviso the Board *may,* but is not compelled to, pay in lieu of the subsidy otherwise provided in section 603(b), "such sums as he shall determine to be necessary to make the cost of operating such vessel competitive with the cost of operating similar vessels under the registry of a foreign country." [Emphasis in original.] [5]

5. In *Aeron Marine Shipping Co. v. United States,*    695 F.2d 567, 571 n. 12 (D.C.Cir.1982), in ob-

2. Each of the applicable subsidy agreements establishes that the parties limited the items for which subsidy is payable to wages, maintenance and repairs not compensated by insurance, hull and machinery insurance, and protection and indemnity insurance.

3. The regulations applicable to the payment of ODS, 46 CFR Part 252, provide payment of subsidy only for the aforementioned items of expense and include no provision for the payment of subsidy for fuel.

4. The text of section 606(1) clearly contemplates that the permissible subjects for hearing are limited to "items theretofore considered and on which such contract was based" and "changes occurring since the contract was entered into." An additional item, not considered and not a basis of the contract, is not subject to a hearing.

Of all the companies, Aeron alone was conditionally authorized to receive a propulsion system expense differential subsidy in Contract No. MA/MSB–166, which was executed prior to promulgation of 46 CFR Part 252. This authorization was limited to a seven-year period commencing with charter of nominally three vessels to a named charterer; provided for no payment if a certain charterhire rate was exceeded on any voyage days during that period; called for repayment if that charterhire rate was exceeded on other voyage days; and specified that any Board determination of subsidy payable was not subject to a hearing under section 606(1). As it turned out, only two vessels entered service and both were fixed to the named charterer for a period longer than seven years. Aeron not only has not requested any subsidy

over the years, it has supplied no data with respect to the condition specifying a certain charterhire rate during the seven-year period. Beyond that period, Aeron stands in exactly the same position as the other companies.

As to Aeron, the reasons for denial of the request for fuel subsidy and for a hearing under section 606(1) were as follows:

1. For the period following expiration of the seven years commencing with charter of the vessels, the same reasons enumerated hereinabove.

2. For the said seven years of the charters, lack of any data from Aeron upon which to determine whether the charterhire rate condition in the Contract MA/MSB–166 was or was not satisfied.

3. For the said seven years of the charter, Aeron has not heretofore made any specific claim for that period (and does not appear to be making any such claim now), and the Board has relied on the lack of any such claim for the seven-year period in funding its subsidy liabilities. Reduced to its essentials the application, in effect, is a request for modification of the respective operating-differential subsidy agreements. The Board declines to exercise its discretion to accept such proposed modification.

Plaintiffs filed their complaint in this court on February 21, 1985, contesting the Board's denial of their application for fuel cost subsidies. The parties' summary judgment motions followed.

### III. *Discussion*

As indicated previously, all of the subsidized vessels involved in this case were

serving that "fuel costs are not subsidized," the District of Columbia Circuit stated:

"Under § 603(b), 46 U.S.C. § 1173(b), the Subsidy Board 'may' pay bulk cargo ships, 'in lieu of the [usual ODS payment for wages, insurance, maintenance, and repair], such sums as ... [are] necessary to make the cost of operating such vessel competitive with the cost of operating similar vessels under the registry of a foreign country.' The Subsidy Board has not, how-

ever, used this discretionary power to pay ODS for fuel costs."

Applicable regulations, 46 CFR § 252 (1985) did not, and do not, deal with fuel cost subsidy, although said regulations did, and do, cover subsidized items such as Wages of officers and crew (§ 252.31), Maintenance and repair (§ 252.32), Hull and machinery insurance (§ 252.33), and Protection and indemnity insurance (§ 252.34).

built at various times during the 1973—1976 period under June 1971 CDS contracts. Simultaneously, the parties also agreed that differential subsidy would be available to operate these vessels. In the early 1970's, United States vessels generally, including the vessels involved in this case, were built with steam turbine engines, while foreign vessels were generally built with diesel engines. It is accepted that diesel engines are more fuel-efficient than steam turbine engines, but require more frequent repairs. At the time plaintiffs contracted to build the vessels in suit, use of steam turbine engines made economic sense because United States repair costs were generally higher than foreign repair costs, and hence the lower repairs costs associated with steam engines served to offset the extra fuel costs associated therewith *vis-a-vis* use of diesel engines. However, in late 1973 and early 1974 and thereafter, there was an escalation in fuel prices worldwide; as a result, steam-powered vessels, like those involved herein, became more costly to operate than diesel-powered foreign vessels. This set of changing circumstances under which plaintiffs' vessels were operating, made, plaintiffs maintain, the ODS they received under their subsidy agreements fall far short of making their vessels fully competitive with similar foreign vessels in the period 1973 and thereafter. Such a situation, plaintiffs argue, calls for fuel cost subsidies under the Act and their ODS agreements.

—A—

As to certain critical and material facts there is no dispute between the parties. The vessels of plaintiffs were operated at all times in essential bulk cargo carrying service. All vessels were entitled to ODS.

Further, from late 1973 until some time into the 1980's, the fuel costs of plaintiffs' steam turbine-powered vessels were greater than the fuel costs of similar and competitive diesel-powered foreign vessels. Materials presently before the court suggest that this fuel cost differential made plaintiffs' vessel less competitive with the foreign-flag vessels. Since the purpose and intendment of the applicable statute, the Merchant Marine Act of 1936, as amended, *supra*, and the implementing ODS agreements of plaintiffs was to ensure competition by equalizing the operating expenses of plaintiffs' American-flag vessels *vis-a-vis* foreign-flag vessels, the above-mentioned fuel cost differential would appear, on the surface, to call for fuel cost subsidies relative to the operation of plaintiffs' vessels under their ODS contracts.

The Board, in denying fuel cost subsidies to plaintiffs, based its determination on the fact that the ODS agreements with plaintiffs limited subsidy only to items specifically set forth in said agreements, *i.e.,* wages, maintenance and repairs not compensated by insurance, hull and machinery insurance and protection and indemnity insurance. The Board noted the ODS agreements did not specifically designate fuel costs as a subsidized item.[6] The Board supported its determination by noting that applicable regulations (46 CFR Part 252) only covered the above-mentioned items as specific subsidy items and did not cover fuel costs as an item of subsidy. The Board made no reference at all in its denial of plaintiffs' application for fuel cost subsidies to the fact said application was based on the assertion that the fuel cost differential between operation of plaintiffs' vessels and operation of similar foreign vessels

---

**6.** As noted earlier, the Aeron Marine ODS agreement contained provisions dealing with a propulsion system expense differential that embraced a fuel expense differential offset. Such a fuel expense likewise was not covered by applicable regulations (46 CFR Part 252). In denying Aeron Marine's claim for general fuel cost subsidy, the Board relied on the absence of such a subsidy item in its ODS agreement. With respect to the propulsion system fuel expense provision of Aeron Marine's agreement, the Board refused to grant the request because of a lack of charter hire data from Aeron Marine for the 7–year period fixed in the contract and the failure of Aeron Marine to make a specific claim for such a fuel expense claim under the propulsion system expense provisions of its ODS agreement prior to the July 23, 1984 application.

was restricting plaintiffs' ability to compete with said foreign vessels.

The Board likewise denied plaintiffs a hearing based on its reading of 46 U.S.C. § 1176 (Act section 606(1)), *supra*, that a hearing is only available with respect to subsidy items identified in the ODS agreements, *i.e.*, wages, maintenance and repairs and insurance. The language of section 1176 relied on by the Board in this regard reads in pertinent part: " * * * items theretofore considered and on which such contract was based" and "changes occurring since the contract was entered into * * *." Since fuel costs were not identified as a subsidy item in plaintiffs' ODS agreements, the Board concluded plaintiffs were not entitled to a hearing on their application for fuel cost subsidies. Denying plaintiffs a hearing on their application, under the circumstances of this case, was improper. *See American President Lines, Ltd. v. United States*, 212 Ct.Cl. 574, 576, 553 F.2d 104 (1977).

█ The Board's reading of 46 U.S.C. § 1176 was niggardly, unreasonable and worked against congressional purposes. While the Board's interpretation of section 1176 is entitled to great deference, as claimed by defendant citing *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969), said interpretation need not be accepted when it is deemed "plainly unreasonable." *Lead Industries Assoc. v. EPA*, 647 F.2d 1130, 1147 (D.C.Cir.), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).

█ Section 1176 provides for a review and readjustment of ODS contracts by the Secretary, and indicates that on application of a contractor for a subsidy adjustment, the Secretary "shall, after a proper hearing, determine the facts and make such readjustment in the amount of such future payments as he may determine to be fair and reasonable and in the public interest * * *. His decision shall be based upon and governed by the changes which may have occurred since the date of said contract, with respect to the items theretofore considered and on which such contract was based, *and other conditions affecting shipping*, * * *." (Emphasis added.) The underscored language was not considered by the Board. The fuel cost differential, as alleged by plaintiffs, reflected conditions affecting shipping that reduced the ability of plaintiffs' vessels to compete with similar foreign vessels. Such allegations, given the purpose and intendment of the governing statute and the implementing contracts to place American-built ships on an operating parity with Foreign-built ships, were sufficient to warrant a hearing, accepting *arguendo* the Board's restrictive reading of section 1176. More directly, both the Board and defendant read the language " * * * changes which may have occurred since the date of the contract * * *" as meaning changes in conditions of wages, maintenance, repairs and insurance items. However, since these items are already covered by review and readjustment provisions, to apply the above changes language, *supra*, to them would seem unnecessary and redundant. Accordingly, said language becomes meaningful and operative only when interpreted to cover changes that have occurred since the date of the contract, *e.g.*, the escalation in fuel costs and the large increase in fuel cost differential that served to lessen the competitive positions of plaintiffs' vessels *vis-a-vis* similar foreign-flag vessels. A Board interpretation of section 1176 that is inconsistent with or at odds with general congressional purposes need not be accepted. *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978). *See generally National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 181–82 (D.C.Cir.1982); *Trustees of Indiana University v. United States*, 223 Ct.Cl. 88, 94, 618 F.2d 736, 739 (1980).

—B—

Defendant, in its motion for summary judgment, contends plaintiffs' complaint fails to state a contractual claim upon which relief can be granted. In substance,

defendant argues, simplistically, that since fuel costs were not set forth as a subsidy item in the ODS agreements, plaintiffs have no contractual entitlement to fuel cost subsidies. Defendant recognizes, however, that a contractual basis for a fuel subsidy claim is arguably available under 46 U.S.C. § 1176, *supra.* Section 1176 provides in pertinent part: " * * * (1) that the amount of the future [ODS] payments to the contractor shall be subject to review and readjustment from time to time" at the request of the Secretary or the contractor. To thwart any such argument, defendant seizes on the word "future" and asserts that since plaintiffs did not file their application for subsidy with the Board until 1984, they cannot rely on section 1176 to recover fuel cost differentials under. their ODS agreements.

Defendant's position is flawed in this regard. The "amount of future payments to the contractor" reflects the procedures [7] utilized in determining a subsidy rate for payments and does not in any way serve to preclude a subsidy claim under the contract on an item of operational expense, whether set forth specifically in the contract or not, that "may be necessary to make the cost of operating plaintiffs' vessels competitive with the cost of operating similar vessels under the registry of a foreign country." 46 U.S.C. § 1173(b). The practice and procedure relative to a determination in 1984 by the Board of plaintiffs' fuel cost subsidy would, assuming full costs to be under the circumstances a proper subsidizable item, fall within this mold. The "future payments" language is not to be deemed a deterrent to the assertion of a contract claim merely because the Board refused to consider fuel costs a subsidy item.

■ Defendant's position that plaintiffs have failed to state contractual claims upon which this court can grant relief is skimpy and unpersuasive. A fair reading of plaintiffs' complaint sufficiently alleged claims for additional fuel cost subsidies upon which this court can grant relief. *See generally Moore-McCormack Lines v. United States, supra,* 188 Ct.Cl. at 667–69, 413 F.2d at 582–83; *Pacific Far East Lines, Inc. v. United States,* 184 Ct.Cl. 169, 184, 394 F.2d 990, 998 (1968).[8]

---

7. In general, the practice of the Maritime Administration (MARAD) relative to ODS payments was to make, as an interim procedure, tentative subsidy payments for voyages in a year on the basis of tentative subsidy rates usually based, as the years passed, on the subsidy rates of earlier years. At a future time, new final readjusted subsidy rates, *i.e.,* "future payments," were determined by the MARAD. Thus, the final subsidy rate for voyages during a particular year might not take place until years after the voyages took place for which the subsidy was being paid. This was so because MARAD had to calculate subsidy rates with reference to operating expenses incurred in completed operations of domestic subsidized vessels with reference to operational expenses or costs incurred by *competitive foreign-flag vessels in the same year or period* utilized for subsidy calculation. Plaintiffs cite as an example of this practice and procedure plaintiff Aries Marine's vessels Ultramar and Ultrasea. These vessels had been in subsidized operation since August 1973 and March 1974 respectively. The initial tentative subsidy rates were established on or about March 27, 1974. The first final subsidy rate for wages for the period August 9, 1973—June 30, 1977 were determined on April 22, 1981. The first final subsidy rates for insurance covering the calendar years 1973—1977 were determined on January 13, 1982. The first final subsidy rates for maintenance and repair covering the calendar years 1973—1977 were determined on July 20, 1982. The "future payments" language merely reflects the practice and procedure of MARAD in the evolution of subsidy payments that are subject to review by the Secretary or the contractor from time to time over a period of years. Thus "future payments" for past voyages on the basis of data assembled over a period of years allowed MARAD to determine readjusted subsidy rates retroactively.

8. The legal validity of the ODS agreements as the basis for a cause of action springs from the fact that in their dealings with defendant, plaintiffs' interest in the subsidy is not a matter of grace or of mere statutory largesse, but embraces mutually enforceable undertakings. The parties entered into 20–year contracts under which both assumed a number of obligations. Plaintiffs allege in their complaint that the parties mutually intended that operating differential subsidies would be paid plaintiffs such that the cost of operating plaintiffs' vessels would be competitive with the cost of operating similar vessels under foreign registry. Plaintiffs further claim that when they entered into their ODS contracts, fuel cost differentials were not significant but that subsequently said fuel cost differentials became significant sufficient to make

—C—

It is clear that Congress designed the operating-differential subsidy to bring the costs of operating United States bulk cargo vessels into parity with those of similar foreign ships. *See Aeron Marine Shipping Co. v. United States*, 695 F.2d 567, 570 (D.C.Cir.1982). At the time of the parties' agreements, those items of costs that were recognized by Congress (46 U.S.C. § 1173(b)) as precluding domestic parity were wages, maintenance and repairs and insurance. Accordingly, those items were usual subsidy items and thus were specifically ear-marked as such in 1970–1974 ODS agreements. Other operating costs were not so designated because Congress did not expect them to differ significantly for domestic and foreign vessels. However, in 1970, Congress amended the Merchant Marine Act of 1936, *supra*, to encourage development and operation of domestic bulk cargo carriers. Merchant Marine Act of 1970, Pub.L. No. 91–469, 84 Stat. 1018, 1023.

The legislative history of the 1970 amendment, *supra*, wherein Congress recognized that there was a lack of experience on which to draw to compare American and Foreign operating costs in the commercial bulk trades, added an important proviso to the Merchant Marine Act of 1936 that authorized the Secretary to pay operating-differential subsidy to bulk carriers "as he shall determine to be necessary to make the cost of operating such vessels competitive with the cost of operating similar vessels under the registry of a foreign country * * *." (46 U.S.C. § 1173(b)). Congress recognized that American shipping would be in an innovative period when entering a competitive market from which American carriers had been effectively excluded previously because of cost differentials. As a result, Congress wanted the Secretary to have broad discretion and flexibility in administering the ODS program in order to ensure that domestic bulk cargo vessels were competitive with similar foreign vessels. Hearings Before The Merchant Marine Subcommittee Of The Committee On Commerce, Senate, 91st Cong., 2nd Sess. 63 (1970); H.R.Rep. No. 91–1073, 91st Cong., 2nd Sess. 38–39 (1970). Congress realized that changes in vessel operations could occur that would require subsidy additions and changes. The Secretary, accordingly, was given broad discretion to meet these changes and make necessary subsidy adjustments in order to ensure that American bulk cargo vessels remained competitive with similar foreign vessels. This background discussion gives further support to the previous discussion regarding the Board's unreasonable interpretation of 46 U.S.C. § 1176 (*see* p. 246, *supra*).

Subsequent to 1973, conditions did change and affected domestic shipping costs. As a result, the cost differential between the costs necessary to operate plaintiffs' vessels and the costs incurred in operating similar foreign vessels widened. Until recently, domestic bulk cargo vessels, including plaintiffs' vessels, were built, as noted earlier, with steam turbine engines while similar foreign vessels were built with diesel engines. While diesel engines were more fuel-efficient than steam turbine engines, they required more frequent repairs. When plaintiffs contracted to build their vessels under CDS agreements, and to operate them under ODS agreements, steam engines made economic sense since the overall repair costs associated with steam turbine engines were lower than those of diesels and offset any extra fuel expense that might result from use of a steam engine rather than a diesel engine. As a result of the fuel crisis, which arose in late 1973—early 1974 and grew progressively worse thereafter, fuel costs escalated greatly. The result of the escalation was that plaintiffs' steam-operated vessels became much more expensive to operate than foreign operated diesel-powered vessels. Accordingly, ODS for operation of plaintiffs' vessels fell short of making

plaintiffs' vessel non-competitive. Despite these facts, plaintiffs maintain that defendant refuses to pay them fuel cost subsidies and thus has breached those contracts. Such allegations state a cause of action upon which relief can be given.

those vessels fully competitive with foreign vessels. This conclusion was reached in *Aeron Marine Shipping Co. v. United States, supra,* 695 F.2d at 571 relative to plaintiff Aeron Marine's vessels, and it appears applicable to the vessels of the other plaintiffs as well.

■ The court gleans from the legislative materials, as well as from the language of 46 U.S.C. § 1173(b) itself, that the Secretary, acting through the Board, has the discretionary power to pay ODS for fuel costs. The Secretary, however, has not, to the court's knowledge, subsidized fuel costs to this date. *See Aeron Marine Shipping Co. v. United States, supra,* 695 F.2d at 571. Since the materials presently before the court show that the higher fuel costs of plaintiffs' bulk cargo vessels put them at a competitive disadvantage *vis-a-vis* similar foreign vessels, it would appear that consideration by the Secretary, in the exercise of his discretion, of whether under these circumstances plaintiffs are entitled to fuel cost subsidy on their application therefor, would be in order. The Board denied plaintiffs' application for fuel cost subsidies without giving consideration to their entitlement thereto despite plaintiffs' assertions that the ODS paid them under their contracts falls far short of making their vessels fully competitive with similar foreign vessels as mandated by the Merchant Marine Act of 1936, as amended, and as implemented by the ODS agreements plaintiffs entered into with the Secretary.

Defendant's position, simply stated, is that the Secretary's statutory discretion is absolute and not subject to review by this court. Defendant seemingly views the Secretary's discretionary power under 46 U.S.C. § 1173(b) as entirely separate from the ODS contracts. Since the statute only provides that the Secretary "may" grant fuel cost subsidy, defendant argues, the Secretary is not mandated to make such payment. Without such a mandate, defendant contends, the court lacks subject matter jurisdiction under the Tucker Act to consider plaintiffs' claims, citing *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct.

948, 954, 47 L.Ed.2d 114 (1976) and *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1008 (1967). Defendant's argument is unpersuasive.

Plaintiffs were entitled to proper exercise of the Secretary's discretion pursuant to the terms of their contracts. The contracts all provided that "[s]ubsidy payments shall be based upon rates determined * * * in accordance with Section 603 of the Act [46 U.S.C. § 1173(b)]." The contracts and the Act must be viewed together. *See, e.g., Farrell Lines, Inc. v. United States,* 204 Ct.Cl. 482, 497, 499 F.2d 587, 596 (1974); *Moore-McCormack Lines v. United States, supra,* 188 Ct.Cl. at 667, 413 F.2d at 582. The contract thus implement the plan prescribed by Congress for the payment of subsidies. *See Farrell Lines, Inc. v. United States, supra,* 204 Ct.Cl. at 497, 499 F.2d at 596, including the grant of discretion to the Secretary. It is well established that discretionary acts under subsidy contracts are reviewable by this court. *See, e.g., Pacific Far East Line, Inc. v. United States,* 184 Ct.Cl. 169, 184, 394 F.2d 990, 998 (1968).

■ In any event, plaintiffs are claiming money (fuel cost subsidy) improperly denied them under their contracts and the controlling statute. The arbitrary or capricious exercise, or the abuse of discretion to grant pay when it is requested and authorized is a sufficient mandate to pay given the statute (46 U.S.C. § 1173(b)) and plaintiffs' implementing ODS agreements. The fact that plaintiffs' vessels were not competitive with like foreign vessels because of higher domestic fuel costs can fairly be interpreted, for jurisdictional purposes, as requiring the payment of compensation for improper denial of fuel cost subsidy. Such a holding clearly furthers the purpose of 46 U.S.C. § 1173(b) and the ODS agreements issued relative thereto sufficient to confer jurisdiction on this court. *See United States v. Mitchell,* 463 U.S. 206, 216–18, 226–27, 103 S.Ct. 2961, 2967–69, 2972–73, 77 L.Ed.2d 580 (1983) (*Mitchell II*).

The determinations of an agency in the statutory scheme found here, which is designed to protect and foster American shipping, are reviewable where said determinations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Aeron Marine Shipping Co. v. United States, supra,* 695 F.2d at 573. *See also Rainbow Nav., Inc. v. Department of Navy,* 783 F.2d 1072, 1078–81 (D.C.Cir.1986); *American Maritime Ass'n v. United States,* 766 F.2d 545, 567–68 (D.C.Cir.1985). Thus, even though the Board had discretion relative to fuel cost subsidies that discretion was not "unlimited," but rather had to be exercised reasonably, *i.e.,* not arbitrarily or capriciously. *See, e.g., Beardmore v. Department of Agriculture,* 761 F.2d 677, 679 (Fed.Cir. 1985). In the court's view, the Board decision on plaintiffs' application for fuel cost subsidies cannot pass the muster of judicial reviewability.

The critical flaw in the Board's determination was its failure to acknowledge and deal with the merits of the question presented to it, *i.e.,* whether plaintiffs' are entitled to fuel cost subsidies. It seems to the court, on the basis of materials presently before it, that facts supportive of entitlement to fuel cost subsidies exist which would justify favorable consideration by the Board, *viz.,* higher domestic fuel costs rendered plaintiffs' vessels unable to compete with like foreign vessels. It is established that plaintiffs' vessels were operated in an essential bulk carrying service for which the fuel cost subsidy is sought. Such facts fit securely in the mold established by 46 U.S.C. § 1173(b), absent other considerations not presently known.

In reviewing the Board determination, the court finds that the Board did not examine any relevant data as to the fuel cost differential between plaintiffs' vessels and like foreign vessels, nor did it articulate an explanation as to why plaintiffs were not entitled to a fuel cost subsidy if their vessels were, because of higher fuel costs, unable to compete with like foreign vessels in the bulk cargo carrier trade. In court's opinion, the Board did not "examine the

relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)), *quoted in Rainbow Nav., Inc. v. Department of the Navy, supra,* 783 F.2d at 1080–81. Rather, it appears to the court that the Board simply failed to exercise its discretion at all, and merely issued a *pro forma* denial of plaintiffs' claim. Where an agency has discretion, but fails to utilize it, its action need not be upheld. *See, e.g., United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 268, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954).

■ Section 1173(b) is a legislative attempt to protect existing American vessels from the competitive harm that would result if there was not operating cost parity with foreign vessels. The basic statutory mechanism for protecting carriers such as plaintiffs is an administrative determination whether there is domestic-foreign cost parity in the bulk cargo trade. As a result, it is incumbent on the Board to make an independent inquiry, when presented with an application that alleges lack of such parity and resulting loss of ability to compete, into whether the purposes and policy of the Merchant Marine Act of 1936, as amended, favor fuel cost subsidy. *See Aeron Marine Shipping Co. v. United States, supra,* 695 F.2d at 574. In the case at bar, the Board's failure to provide plaintiffs with a hearing on their application for fuel cost subsidy and its failure to consider the competitive status of the domestic bulk cargo carrying trade relative to the purposes and policy of the controlling statute, is, under the circumstances, viewed as arbitrary and capricious action. It was unreasonable for the Board to decline to give plaintiffs a hearing and thereby enable itself to bypass or ignore the clear legisla-

tive purpose and intendment of the subsidy program for bulk cargo vessels, *i.e.*, to make the cost of operating domestic vessels such as plaintiffs' competitive with the cost of operating like foreign vessels.

Plaintiffs in their motion for summary judgment seek a ruling by the court that they are entitled to fuel cost subsidies. However, whether plaintiffs are entitled to such subsidies is a determination or judgment that the Board alone is authorized to make. Even though the court has found the initial Board determination to be inadequate and/or improper, this court cannot substitute what it considers to be a more adequate or proper basis for a determination. "To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency." *Securities & Exchange Commission v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Plaintiffs, therefore, are not entitled to a determination from this court that they are, or are not, entitled to a fuel cost subsidy.

—D—

Certain plaintiffs advance additional bases for fuel cost subsidy entitlement in more specific ODS agreement contexts. Plaintiffs Airies Marine, Aeron Marine and Aquarius Marine claim entitlement to fuel cost subsidies in connection with 18 voyages for the carriage of grain from the United States to the Soviet Union. *See* 46 CFR § 294 (1984). Further, plaintiff Aeron Marine also claims entitlement to a fuel cost subsidy pursuant to the express terms of its ODS contract, *i.e.*, propulsion system

expense differential. *See ante* pp. 242–243. Neither one of these claims was set forth in plaintiffs' complaint in this court. More importantly, neither issue was raised in plaintiffs' claim before the Board.[9]

It is well settled that where an administrative remedy is provided and the parties agree, or are otherwise bound, to avail themselves of it, plaintiffs must exhaust such administrative remedies prior to seeking relief in this court. *See, e.g., Arlington Alliance, Ltd. v. United States*, 231 Ct.Cl. 347, 354, 685 F.2d 1353, 1358 (1982). Here, the contracts and the statute plainly set forth a regime wherein rate disputes, which is what these two claims are, in essence, would be brought before the Board for resolution. Accordingly, this court declines to rule on said claims.[10] These claims, however, should, on remand to the Board, be considered on their merits by the Board at the hearing dealing with the entitlement of plaintiffs to fuel cost subsidies generally.

IV. *Conclusion*

The Board has the authority under the Merchant Marine Act, as amended, to grant fuel cost subsidy to plaintiffs upon determination of the facts and to make readjustment in the amount of future payments to plaintiffs as it may determine to be fair and reasonable and in the public interest. It was arbitrary, capricious, unreasonable and a clear abuse of discretion on the part of the Board to refuse to grant plaintiffs a hearing on their fuel cost subsidy application and to fail to articulate a satisfactory explanation, on the merits, of plaintiffs entitlement, or lack thereof, to fuel cost sub-

9. By letter dated October 22, 1980 Apex Marine, operating agent for plaintiffs, requested the Board to inform it regarding how much plaintiffs would be entitled to under the grain shipping program. Apparently, the operating agent was told orally by a member of the Board that plaintiffs were not entitled to fuel cost subsidy under the grain program. Plaintiffs did not pursue this matter any further until the present action.

The January 29, 1985 Board denial of plaintiffs July 23, 1984 application for fuel cost subsi-

dies included a denial, for lack of proof (information), of Aeron Marine's propulsion system fuel expense differential claim, but it is not clear whether Aeron Marine was ever offered the opportunity to prove its entitlement thereto.

10. In any event, it is felt that these claims fall within the primary jurisdiction of the Board. *See, e.g., Oceanic Steamship Co. v. United States*, 218 Ct.Cl. 87, 121–22, 586 F.2d 774, 793–94 (1978).

sidy under their ODS contracts. For the reasons discussed above, plaintiffs are entitled to a proper hearing before the Maritime Subsidy Board under 46 U.S.C. § 1176 on their application for fuel cost subsidy, with the Board directed to determine whether such fuel cost subsidy was and is necessary to make the cost of operating plaintiffs' vessels competitive with the cost of operating similar vessels under the registry of a foreign country as provided for under 46 U.S.C. § 1173. This case is therefore remanded to the Maritime Subsidy Board and the Secretary of the Department of Transportation for further proceedings consistent with this opinion.[11]

The Clerk of the Court is directed to transmit this case and this opinion therein to the Maritime Subsidy Board and the Secretary of the Department of Transportation for appropriate fuel cost subsidy determinations. Experience has shown that subsidy rate determinations unfortunately take a long period of time; it is not unreasonable to expect that several years or more will pass before these determinations are finalized. In the court's view, it would be unnecessary and a waste of the court's resources to retain this case on its docket so as to monitor, at periodic intervals, the administrative progress of this remand. Accordingly, the Clerk of the Court shall dismiss the complaint in this case, without costs and without prejudice to reinstatement of the case and complaint on timely notice by plaintiffs with respect to final administrative determinations on their application for fuel cost subsidy. If the case and complaint is reinstated upon the filing of such a notice, it shall be without payment of any additional filing fee, and it shall be deemed reinstated *nunc pro tunc* to the date of this opinion, and an order will be entered scheduling an immediate status conference on the matter. (*See* RUSCC 60(b)(6).)

IT IS SO ORDERED.

11. Such an order under these circumstances may not constitute a final judgment for appeal

purposes. *See Cabot Corporation v. United States,* 788 F.2d 1539 (Fed.Cir.1986).